**PUBLICKER CHEMICAL CORP.,**
Plaintiff-Appellee,

**Liquid Specialists, Inc.,**
**Intervenor-Appellee,**

v.

**BELCHER OIL COMPANY,**
Defendant-Appellant.

No. 85–3356.

United States Court of Appeals,
Fifth Circuit.

June 18, 1986.

---

Dermot S. McGlinchey, B. Franklin Martin, III, J. Forrest Hinton, New Orleans, La., for defendant-appellant.

Roy C. Cheatwood, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Nancy Scott Degan, New Orleans, La., for Publicker.

Jerry A. Brown, Monroe & Lemann, New Orleans, La., for Liquid Specialists.

Before: WISDOM, RUBIN, and HIGGINBOTHAM, Circuit Judges.

## OPINION

WISDOM, Circuit Judge:

The Louisiana law of obligations governs this diversity action for breach of contract. Belcher Oil Company seized upon a dispute over $5,000 as a means of escaping an undesirable $5 million contract with Publicker Chemical Corporation. The district court entered judgment against Belcher. We affirm.

### I.

Publicker owns petroleum storage facilities in Gretna, Louisiana. In January 1982 Publicker agreed to store Belcher's petroleum products at the Gretna facility for a period of seven years. As required by the contract, Publicker renovated its storage tanks at a cost of more than $1.2 million. Each month Belcher paid Publicker a "base fee" of $65,617.89 in addition to a charge for "blending" the petroleum products averaging $2,611 per month. Liquid Specialists, Inc. earned a commission for bringing the parties together and conducting some of the negotiations.

Belcher payed Publicker 36 cents for each barrel of petroleum products it stored at Gretna. When the contract was signed, petroleum "terminalling" charges averaged between 50 and 75 cents per barrel. By early 1984, however, demand for petroleum storage facilities had collapsed. As a result, storage charges dropped to less than 20 cents per barrel. Belcher stood to gain as much as $2.5 million if it could escape its long-term contract with Publicker.

In July 1983 Belcher asked Publicker to run "agitators" installed in the storage tanks whenever the tanks were filled above the six-foot level. The contract does not mention agitation, although Belcher told Publicker during the contract negotiations that its products might require agitation as often as ten times each month. Continuous agitation is not a standard industry practice.

Continuous operation of the agitators increased Publicker's use of electricity. Publicker attempted to recoup the additional cost by offsetting it against a fuel cost adjustment credit Publicker owed to Belcher. Publicker deducted $4,845.30 for agitation costs from July through December 1983.

In a letter dated March 14, 1984, Belcher advised Publicker that it considered Publicker in default of paragraph 4.06 of the contract, set out in full in the margin.[1] Publicker's senior vice president requested a meeting with Belcher representatives to discuss agitation costs in a letter dated March 22. Belcher officials agreed to meet on April 19. On April 18, Belcher officials informed Publicker that they considered the contract terminated under the provisions of Article XIII of the contract.[2]

---

1. "4.06 All fees and charges provided under this Article IV are due and payable without offset, as provided herein."

2. Article XIII provides:

In the event either party shall default in the performance of any obligation on its part to be performed hereunder and if such default shall continue for a period of fifteen (15) days after the receipt of written notice thereof from the other party, or if the default cannot be corrected within said period and the other party does not within said period commence to correct the same and thereafter diligently proceed with the correcting thereof, such other party may terminate this Contract forthwith on written notice to the defaulting party without prejudice to any other right or remedy which such other party may have under

Belcher's actions refute any intention to resolve the dispute over agitation costs. In March of 1984, before meeting with Publicker officials, Belcher contacted one of Publicker's competitors to discuss a new storage contract. At the same time Belcher ordered its manager to sell off reserves stored at the Gretna facility.

By May 1 Belcher had withdrawn all of its oil from Publicker's tanks. Publicker's efforts to find other customers have not been successful.

Publicker sued Belcher for breach of contract. On cross-motions for summary judgment, the district court held that Belcher breached the contract. After hearing evidence on the amount of damages, the court entered judgment for $3,095,589.27, including $244,523 awarded to intervenor Liquid Specialists, Inc. as the balance of its commission. The defendant appeals.

## II.

Publicker contends that it did not breach the contract. In the alternative, if offsetting agitation costs did breach the contract, Publicker contends that Belcher was not entitled to terminate the contract. We reject the first contention but accept the second.

## A.

Publicker contends that it did not breach the contract because: 1) the doctrine of compensation justifies deduction of the agitation expenses; 2) the clause forbidding offsets applies only to Belcher; and 3) the

offset clause does not apply to the fuel cost adjustment.

■ The civil law doctrine of compensation does not justify the offset. That doctrine, as stated in the Civil Code, provides: "When two persons are indebted to each other, there takes place between them a compensation that extinguishes both the debts".[3] The doctrine applies only to uncontested debts, however. "A contested debt ... is not a liquidated one; and cannot be set off, unless he who claims to set it off, has the proof in his hands, and be ready to prove it promptly and summarily.%"[4] Belcher contested its liability for the increased agitation charges in letters dated November 23, 1983 and March 14, 1984. Although the district court ultimately rejected Belcher's arguments that the agitation charges were covered by the "base fee" it paid to Publicker, those arguments were sufficient to create a genuine contest.[5]

■ Contrary to Publicker's assertion, Article IV is not limited to amounts owed to Publicker by Belcher. Paragraph 4.05 provides in part:

To the extent that PUBLICKER's actual fuel costs are above or below this level, BELCHER will pay for or benefit from such cost differentials. Fuel cost adjustments will be made on a Quarterly basis.

Publicker, as well as Belcher, was bound by the offset clause. The fuel cost adjustment is discussed in a letter dated May 6, 1983.[6] Because the letter refers to the same subject matter as paragraph 4.05, we regard the letter as an amendment to that

this Contract or at law or in equity on account of such default.

3. La.Civ.Code art. 2207. The article was revised and renumbered by 1984 La.Acts No. 331, effective January 1, 1985. The quoted language governs this case.

4. *Carter v. Morse*, 8 Mart. 398, 399 (La.1820), quoted in *Hartley v. Hartley*, 349 So.2d 1258, 1261 (La.1977); *see also* 2 M. Pothier, A Treatise on the Law of Obligations, app. xiii at 96–100 (W. Evans trans. 3d Amer. ed. 1853).

5. Publicker understood that Belcher's products would require some agitation. As part of the

renovation required by the contract, Publicker installed agitators in its tanks.

6. The relevant portion of the letter reads:

It is agreed that annually, at the end of each calendar year, Publicker will determine its actual heating fuel costs ..., and in the event such actual costs succeed $86,020.00, Belcher will promptly reimburse Publicker for these costs. Likewise, if the actual costs are less than was originally projected, Publicker will immediately credit Belcher with such cost savings.

paragraph and not as an entirely new contractual provision outside Article IV.

We therefore conclude that Publicker breached its obligation under paragraph 4.05 of the contract by offsetting agitation costs against the fuel adjustment credit.

### B.

■ Not every breach of a contract is grounds for dissolution of the contract under Louisiana law. Louisiana courts have discretion to determine "whether the performance not rendered by [one party] was the cause [7] of [the other party's] obligation, in which case the dissolution [of the contract] must be granted, or whether the failure in the [one party's] performance is not so grave as to have deterred [the other party] from entering the contract, had he foreseen it, in which case he will be granted damages or a proportional reduction of his own performance".[8] Accordingly we have held that "breach of an ancillary obligation will neither of itself excuse the other party from performing nor give sufficient justification for legal dissolution of the contract".[9]

■ The purpose of the contract between Publicker and Belcher was the storage of petroleum products. Publicker's primary obligation under the contract was to provide adequate storage tanks for Belcher's products. Belcher's primary obligation was to pay Publicker the fees and charges specified in the contract. Because the primary purpose of the contract was not frustrated by Publicker's offset of its agitation expenses, Publicker breached only an ancillary obligation.

Under Louisiana law, the parties may "renounce what the law has established in their favor, when their renunciation does not affect the rights of others and is not contrary to the public good".[10] Article XIII of the contract provides for termination "[i]n the event either party shall default in the performance of any obligation ...". Belcher contends that this clause unequivocally expresses the parties' intent to reject the Louisiana jurisprudence of primary and ancillary obligations, and to permit termination for any breach, however insubstantial. It would be remarkable if the parties actually intended such a rule to govern a complex, long-term commercial relationship, between sophisticated parties, involving millions of dollars. Minor mishaps and disagreements affecting contract rights are inevitable in the course of any such relationship. A rule permitting either party to threaten termination of the entire relationship on the basis of any one of these minor incidents will encourage such threats whenever one party finds that the contract is no longer economically advantageous. Prudent businesses ordinarily avoid the risk and uncertainty of such drastic arrangements. If the parties truly had intended to be governed by such a rule, they would have memorialized this intent by referring to the breach of any "primary or ancillary" obligation or words to that effect.[11]

---

7. "Cause", a fundamental civil law concept, refers generally to the principal reason one obligates oneself. *See* S. Litvinoff, 7 *Louisiana Civil Law Treatise* (2 Obligations) § 272 at 514, §§ 196–242, at 353–440 (1975).

8. S. Litvinoff, § 272 at 514, *quoted in Makofsky v. Cunningham,* 576 F.2d 1223, 1231–32 (5th Cir.1978); *see also Watson v. Feibel,* 139 La. 375, 392, 71 So. 585, 591 (1916). The doctrine frequently is employed to enforce building contracts which have been substantially but not entirely performed by the contractor. *E.g., Lambert v. Jones-McCloskey Constr. Co., Inc.,* 311 So.2d 488 (La.App.1975).

9. *Makofsky,* 576 F.2d at 1232. In common law jurisdictions as well, a slight breach by one party does not necessarily relieve the injured party of its obligations under the contract. 11 S. Williston v. W. Jaeger, *A Treatise on the Law of Contracts* § 1292 at 8–9 (3rd ed. 1968).

10. *Louisiana Nat'l Leasing Corp. v. ADF Service, Inc.,* 377 So.2d 92, 95 (La.1979).

11. Publicker's Senior Vice President apparently did not share Belcher's view of the termination clause. He wrote to Belcher on March 22:

Your assertion that Publicker is in default under the contract and your notification pursuant to Article 13.01 are inappropriate. This matter of some $800 per month does not, under any analysis, constitute a material breach of the contract. Because of the relatively small magnitude of this disagreement, I feel that the resolution of this issue might best

Our interpretation is guided by the settled rule that "Louisiana courts will not interpret the words of a contract literally when this leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit".[12] Termination of a $5 million dollar contract because of $5,000 dispute, if not absurd, is surely unreasonable. In view of the collapse in demand for petroleum storage tanks, and of Belcher's decision to negotiate with Publicker's competitor and to sell off its reserves even before discussing agitation costs with Publicker, termination would also be inequitable.[13]

■ We interpret Article XIII of the contract to permit termination only for failure to perform a primary obligation.[14] Because Publicker's offset of its agitation costs breached only an ancillary obligation, Belcher's attempted termination is a breach of the contract for which Publicker is entitled to recover damages.[15]

### III.

■ Belcher asserts that Publicker failed to take reasonable measures to mitigate its damages. Under Louisiana law the party injured by a breach of contract generally is required to mitigate dam-

ages.[16] Contracts of lease are an exception to the general rule: a lessor has no duty to mitigate when the lessee abandons the premises without cause.[17] We therefore consider whether Belcher leased the storage facilities from Publicker.

### A.

Under Louisiana law a lease is "a synallagmatic[18] contract, to which consent alone is sufficient, and by which one party gives to the other the enjoyment of a thing, or his labor, at a fixed price."[19] The "absolutely necessary" elements of a lease are "the thing, the price, and the consent".[20]

■ Although the issue is not free from doubt, we conclude that Louisiana courts would treat the agreement as a service contract rather than a lease. The contract does not specify particular storage tanks as the things being leased. The fees and charges set out in the contract do not specify a "certain and determinate" price as required by the Civil Code.[21] The "base fee" varies with the amount of storage space made available to Belcher, and with the amount of oil processed during the year. The "blending" and "loading" charges depend upon the amount of blending and loading provided by Publicker.

---

be accomplished through a telephone conversation or meeting.

12. *Makofsky,* 576 F.2d at 1229; *Texaco, Inc. v. Vermilion Parish School Bd.,* 244 La. 408, 152 So.2d 541 (1963).

13. For this reason the district court did not err by referring to the equities of the case.

14. Even though termination for breach of a primary obligation is permitted by law, Article XIII is not surplusage because it specifies procedures for termination.

15. We need not decide whether Publicker is entitled to prevail on other grounds as well. Publicker responded by letter within the 15-day period allowed under Article XIII. The letter proposed a meeting to resolve the dispute. Belcher agreed to meet after the 15-day period had expired without notifying Publicker that it intended to terminate the contract before the meeting took place. In these circumstances, a court might hold that Publicker did enough to

satisfy the requirements of Article XIII. Similarly, we need not and do not decide whether Belcher breached the duty to deal in good faith explicated in *National Safe Corp. v. Benedict & Myrick, Inc.,* 371 So.2d 792, 795 (La.1979).

16. *Unverzagt v. Young Builders, Inc.,* 252 La. 1091, 215 So.2d 823, 825–28 (1968).

17. *Lirette v. Sharp,* 44 So.2d 221, 225 (La.App. 1950).

18. "A contract is bilateral, or synallagmatic, when the parties obligate themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other." La.Civ.Code art. 1908.

19. La.Civ.Code art. 2669.

20. La.Civ.Code art. 2670.

21. La.Civ.Code art. 2671.

We conclude that the contract is one for services rather than a lease. Publicker therefore was obligated to mitigate the damages resulting from Belcher's breach.

### B.

Publicker had an obligation to take all "reasonable steps to minimize the consequences of the injury".[22] The district court held that Publicker "made every effort to mitigate its damages". Those efforts included distribution of nearly two thousand brochures and a campaign of advertising in standard trade publications.

■ Belcher nevertheless contends that Publicker was required to mitigate its damages by accepting an offer from Belcher to return to the Gretna facilities at 56 percent of the contract rate. If Belcher merely offered to settle the lawsuit for 56 cents on the dollar, Publicker was of course free to refuse. "One is not required to mitigate his losses by accepting an arrangement with the repudiator if that is made conditional on his surrender of his rights under the repudiated contract".[23]

■ The nature of Belcher's offer is a matter of intense dispute. Publicker asked Belcher to return to the Gretna terminal in December 1984 and January 1985. Publicker offered to accept 34 cents per barrel and to place a small portion of the receipts in escrow pending the outcome of the lawsuit. In a letter dated January 10, 1985, Belcher's vice president asserted that Belcher was willing to consider an offer from Publicker, but denied that Publicker had made such an offer. The letter does not suggest that Belcher ever made an offer to return. Belcher's in-house counsel testified that Belcher never made an offer to return to Publicker's terminal, even at a reduced rate. A Publicker official did testify to second-hand knowledge that Belcher offered to return for 56 percent of the contract rate during discussions between Publicker attorneys and Belcher attorneys. In the light of the testimony of Belcher's in-house counsel, we can regard this only as a settlement offer rather than an offer to return pending the outcome of the suit.[24]

We conclude that Belcher made no definite offer to return to the Gretna terminal pending the outcome of the lawsuit. On the contrary, Belcher rejected several such offers from Publicker. Publicker therefore acted reasonably to mitigate its damages.

\* \* \*

The judgment for the appellees is AF-FIRMED.

22. *Easterling v. Halter Marine, Inc.,* 470 So.2d 221, 223 (La.App.), *writ denied,* 472 So.2d 920 (1985).

23. 5 A. Corbin, *Corbin on Contracts* § 1043 at 274 (2d ed. 1964).

24. In his conclusions of law, the district judge wrote: "The fact that Belcher indicated a willingness to return at a reduced price is not relevant." An indication of willingness to return is not an offer to return, however.