GUNN INFINITI, INC., Petitioner,

v.

Donald O'BYRNE, Respondent.

No. 98–0333.

Supreme Court of Texas.

Argued Jan. 14, 1999.

Decided June 24, 1999.

Rehearing Overruled Aug. 26, 1999.

Douglas W. Alexander, Dana C. Livingston Cobb, Austin, Jonathan Yedor, San Antonio, for Petitioner.

Harry B. Adams, III, Universal City, for Respondent.

Justice OWEN delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice ENOCH, Justice ABBOTT, Justice HANKINSON, Justice O'NEILL and Justice GONZALES join.

We are called upon to decide whether various offers made to a consumer before he sent a DTPA notice letter and filed suit entitled the seller to a jury instruction or question on mitigation of damages. We conclude that in a DTPA case, a defendant's offer that attempts to ameliorate an injury caused by its conduct may raise a fact question on an affirmative defense of mitigation if the offer did not require the plaintiff to release its claims. Because the offers in this case were offers of settlement that implicitly required the plaintiff to relinquish his claims, the seller was not entitled to a jury question on mitigation. However, we agree with the seller that there is no evidence to support the award of mental anguish damages. Accordingly, we reverse the judgment of the court of appeals and remand this case to that court for further proceedings consistent with this opinion.

## I

Donald O'Byrne, a resident of Shreveport, Louisiana, was in the market for a black-with-tan-interior five-speed manual transmission 1993 Infiniti G–20. After he failed to find this particular car in Louisiana, O'Byrne called several Infiniti dealerships in Texas. As a part of his Texas search, he contacted Gunn Infiniti, Inc. in San Antonio. A sales representative at Gunn searched the dealership's inventory and found a car that fit O'Byrne's desires in the body shop where it was being repainted. The Gunn employee told O'Byrne that the dealership had the car he sought. O'Byrne asked the sales representative if the car had ever been damaged, and she told him, falsely, that it had not and that it was brand new. O'Byrne booked a one-way flight to San Antonio to purchase the car. At the dealership,

O'Byrne again asked if the car had been damaged, and the sales representative again told him that it had not, knowing that it had suffered some slight damage. The sales representative also told O'Byrne that the car had an air bag, and a sticker under the hood of the car indicated that the car was equipped with an air bag. But it was not. The original hood of the car had been replaced with the hood of a later model that did have an air bag.

One week after purchasing the car, O'Byrne noticed that the paint on the front of the car was oversprayed and rough. He also suspected that the hood had been removed because the bolts and hinges had been reworked and painted. O'Byrne immediately called Gunn Infiniti. After initial denials, the sales representative eventually admitted that the car had been damaged, repaired, and repainted.

Gunn Infiniti then attempted to find an exact replacement but was unable to locate one because the model year for that car had ended. Gunn Infiniti thereafter made a number of offers to O'Byrne. It offered to refund the purchase price along with any transportation costs O'Byrne had incurred. O'Byrne rejected that offer. Then, Gunn Infiniti offered to replace the damaged car with another one that was the same model but a different color and to pay $1,000. O'Byrne rejected that offer because he wanted a black Infiniti. Next, Gunn Infiniti offered to replace O'Byrne's car with a 1993–and–a–half year model and charge him the dealer invoice price for the additional equipment that was standard on the newer model. Apparently, the 1993 Infiniti G–20 did not come with an air bag or a sun roof, but these additions, among others, were standard on the 1993–and–a–half model. O'Byrne rejected that offer because he did not want to pay for the additional equipment. Finally, Gunn Infiniti offered to have the vehicle shipped to San Antonio and to repaint it for free. O'Byrne wanted Gunn Infiniti to pay for having the car repainted in Shreveport and submitted an estimate. Gunn Infiniti refused that proposal because it thought the estimate was too high. Several months later, O'Byrne attempted to accept the previous offer of a full refund plus expenses, but Gunn Infiniti said that the offer was no longer available because O'Byrne had put several thousand miles on the car.

O'Byrne sued Gunn Infiniti, alleging fraud and violations of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA). At trial, Gunn Infiniti tendered a jury question on the issue of mitigation of damages, but the trial court refused to include the question in the jury charge. The jury returned a verdict for O'Byrne, finding that Gunn Infiniti had violated the DTPA, had engaged in knowing conduct under the DTPA, and had committed fraud. The jury awarded O'Byrne $10,500 in benefit-of-the-bargain damages, $11,000 in mental anguish damages, $50,000 in exemplary or additional DTPA damages, and attorney's fees. The trial court rendered judgment for O'Byrne based on the DTPA findings, adding $2,000 to the actual damages as the DTPA required at the time, for a total of $73,500 in actual and additional damages. Gunn Infiniti appealed on the grounds that, among other things, the trial court failed to submit a question on the issue of mitigation of damages and that there was legally insufficient evidence to support an award of mental anguish damages. The court of appeals affirmed. 963 S.W.2d 787.

We first consider Gunn Infiniti's argument that it is entitled to a new trial because of the trial court's failure to submit the issue of mitigation to the jury.

## II

■ As an initial matter, O'Byrne contends that the settlement-offer provisions of the DTPA foreclose the application of common-law mitigation principles. We disagree. Nothing in the DTPA evidences a legislative intent to withdraw mitigation of damages as an affirmative defense, even when a defendant alleges that the consumer failed to mitigate by failing to accept the defendant's offer to mitigate. Nor

does the concept of mitigation inherently conflict with the DTPA.

The DTPA causes of action in this case are governed by the Act as it existed before the 1995 amendments. Former section 17.505 contained procedures under which a defendant could potentially limit the damages recovered by a plaintiff who rejected a settlement offer.[1] Those procedures were largely reenacted in what is now section 17.5052 of the DTPA. *See* TEX. BUS. & COM.CODE § 17.5052. However, because there are some differences in the language used in the current statute and that used in its predecessor, we will refer only to former section 17.505.

The settlement-offer mechanism of former section 17.505 and the common-law doctrine of mitigation have some principles in common, but they nevertheless embody distinct concepts. The DTPA settlement-offer provisions of former section 17.505 were designed to limit the total amount of damages that a consumer could recover. They were not designed to mitigate damages that a consumer might otherwise suffer. *See* former TEX. BUS. & COM.CODE § 17.505(d). A seller who committed a deceptive act or engaged in deceptive trade practices could attempt to avoid the punitive provisions of the DTPA, even after demand was made or suit was filed, by making a settlement offer that would compensate the consumer for actual damages. *See id.* Under former section 17.505, the consumer's actual damages are to be determined by the trier of fact without reference to the settlement offer. *See id.*

■ Under mitigation principles, the long-standing law of this state requires a claimant to mitigate damages if it can do so with " 'trifling expense or with reasonable exertions.' " *Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex.1995) (quoting *Walker v. Salt Flat Water Co.*, 128 Tex. 140, 96 S.W.2d 231, 232 (1936)). The duty to mitigate often is not dependent on an offer from the wrongdoer. And a consumer may have the opportunity to mitigate his or her damages immediately after the deceptive act or practice occurred, well before any DTPA notice letter is sent or suit is filed. Nothing in the DTPA suggests that the Legislature intended to abrogate this aspect of the common law. Nor does the DTPA suggest that a defendant should be discouraged from offering to mitigate damages before a consumer sends a DTPA notice letter or files suit. A defendant may see the error of its ways promptly after the deceptive or unconscionable act occurred and seek to forestall all or at least some of the damages suffered by a consumer. Requiring a plaintiff to mitigate when a reasonably prudent person would do so is not at odds with the settlement mechanism contained in the DTPA.

Other differences between a DTPA settlement offer and the common-law duty to mitigate are the applicable time periods and whether a jury as opposed to a court determines the effect of a defendant's offer. But, here again, these differences do not result in a conflict or even tension between the DTPA and the common-law duty to mitigate. Under former section 17.505, a defendant such as Gunn Infiniti could make a settlement offer to a plaintiff only within defined periods after the plaintiff sent written notice or filed suit. *See* former TEX. BUS. & COM.CODE § 17.505(c). If the plaintiff rejected the settlement offer, the defendant could file it with the trial court along with an affidavit confirming the rejection. *See id.* § 17.505(d). After trial, if the court found that the amount offered was the same as or substantially the same as the actual damages found by the trier of fact, then the plaintiff's recovery was limited to the lesser of the settlement offer or the actual damages found at trial. *See id.* The settlement offer was not admissible as evidence in a jury trial. *See id.*

---

**1.** *See* Act of May 22, 1989, 71st Leg., R.S., ch. 380, § 3, 1989 Tex. Gen. Laws 1490, 1491–92, *amended by* Act of May 17, 1995, 74th Leg., R.S., ch. 414, § 6, 1995 Tex. Gen. Laws 2988, 2993–94 [hereinafter former TEX. BUS. & COM. CODE § 17.505].

■ We cannot agree with O'Byrne that the DTPA settlement-offer provisions supplant any common-law duty to mitigate if a defendant offers to alleviate some or all of a consumer's damages. Nor can we divine any reason for exempting DTPA damage claims from a duty to mitigate. Although the issue has never been squarely addressed by this Court, we observed in *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812 (Tex.1997), that "a [DTPA] plaintiff's recovery of damages [can be] limited ... by the defendant's evidence of the plaintiff's failure to reasonably mitigate losses." *Id.* at 817. While that observation was not central to our holding, we note that some courts of appeals have considered the issue and have reasoned that, because the "actual damages" available under the DTPA before its amendment in 1995 were those available at common law, the "duty to mitigate" or the "doctrine of avoidable consequence" applies to the DTPA. *Pinson v. Red Arrow Freight Lines, Inc.*, 801 S.W.2d 14, 15 (Tex.App.—Austin 1990, no writ); *see Great State Petroleum, Inc. v. Arrow Rig Serv., Inc.*, 706 S.W.2d 803, 807 (Tex. App.—Fort Worth), *modified on other grounds on reh'g*, 714 S.W.2d 429 (Tex. App.—Fort Worth 1986, no writ); *see also* Bullion, *An Understanding of Damages Recoverable Under the DTPA*, 20 ST. MARY'S L.J. 667, 685–87 (1989). We likewise hold that a plaintiff in a DTPA case has the same duty to mitigate damages as in other cases.

We turn to Gunn Infiniti's contention that the offers it made to O'Byrne entitled it to an instruction or jury question regarding mitigation.

### III

Gunn Infiniti contends that the offers it made to O'Byrne raise a fact question on whether he failed to mitigate his damages, particularly his mental anguish damages. Gunn takes the position that none of its offers required O'Byrne to release his claims but that even if they had done so, a jury should be permitted to decide whether O'Byrne failed to mitigate.

■ The duty to mitigate has not generally included a duty that the claimant relinquish its right to have its claims heard and resolved by a court. In breach of contract cases, it is well-settled that a plaintiff is not required to accept offers from the breaching party if they are "conditioned on surrender by the injured party of his claim for breach." RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. e (1981); *see also Publicker Chem. Corp. v. Belcher Oil Co.*, 792 F.2d 482, 488 (5th Cir.1986) (quoting 5 CORBIN, CORBIN ON CONTRACTS § 1043, at 274 (1964) (" 'One is not required to mitigate his losses by accepting an arrangement with the repudiator if that is made conditional on his surrender of his rights under the repudiated contract.' ")); *Hanna v. Lott*, 888 S.W.2d 132, 138 (Tex. App.—Tyler 1994, no writ) (holding that plaintiff had no duty to accept amount tendered by an insurance company for a demolished car if the plaintiff believed the car was worth more than the amount offered); *Crum & Forster, Inc. v. Monsanto Co.*, 887 S.W.2d 103, 131 (Tex.App.—Texarkana 1994, no writ). *But see Guaranty Abstract Co. v. Denman*, 209 S.W.2d 213, 215 (Tex.Civ.App.—Texarkana 1948, writ ref'd) (stating in dicta that if the plaintiff could have been made whole by accepting a tender of the full amount at issue, it had a duty to effect such a settlement).

We recognize that when there is a claim for ongoing mental anguish damages, a claimant may actually increase his or her damages by rejecting a settlement offer that would put an end to the dispute. Gunn Infiniti insists that is the case here. At trial, O'Byrne sought mental anguish damages for the three years intervening between his purchase of the car and the date of trial. O'Byrne testified that his anguish was continuing and worsened over time because the car was a thorn in his side and because he was sickened each time that he saw or drove it. Gunn Infiniti counters that it offered to remove this thorn by taking the car back and refunding the purchase price, replacing the car with a red one, or repainting the car that

O'Byrne bought. Gunn points out that the mental anguish damages continued to mount after these offers were rejected and then, at trial, the $50,000 in additional damages awarded by the trial court under former section 17.50(b)(1) of the DTPA were partially based on the alleged mental anguish.

■ The answer to Gunn Infiniti's argument is that each of its offers would raise a fact question for the jury on mitigation if the offers were indeed unconditional offers to mitigate damages rather than offers of settlement. If O'Byrne could have accepted any one of Gunn Infiniti's offers and still could have pursued claims at trial, then the jury could weigh all the evidence and reach a decision on mitigation. But foreclosing a plaintiff from pursuing suit is not mitigation. If a defendant is truly offering to mitigate, the offer cannot implicitly or explicitly seek a release of the plaintiff's claims. It must be an unconditional offer to mitigate. *See Barrett v. United States Brass Corp.,* 864 S.W.2d 606, 634 (Tex.App.—Houston [1st Dist.] 1993), *rev'd on other grounds sub nom. Amstadt v. United States Brass Corp.,* 919 S.W.2d 644 (Tex.1996); RESTATEMENT (SECOND) OF CONTRACTS § 350 cmt. e, illus. 15 (1981).

■ We also note that whether an offer raises a fact question regarding mitigation does not turn, as the court of appeals indicated, on whether the offer would afford full relief to the plaintiff. *See* 963 S.W.2d at 793. In some circumstances, a defendant may offer to mitigate some but not all of a plaintiff's damages. For instance, if the car that O'Byrne purchased had also been defective and would not run, and if Gunn Infiniti had offered to loan him a replacement car for a period of time, this would be evidence of mitigation of some but not all damages. Or, in an example more similar to the facts of this case, if Gunn Infiniti had made an offer to mitigate, rather than to settle, by offering to replace the black G–20 with another car and if O'Byrne had accepted that offer, O'Byrne could still sue for consequential

damages. Such damages might include his airfare to San Antonio, any mental anguish damages that might be legally recoverable, any uncompensated direct damages if the car that Gunn substituted had a value less than the value that the original car would have had if it had been as represented, and additional damages offered by the DTPA. *See* TEX. BUS. & COM.CODE § 17.50(b).

It would be problematic from a practical standpoint if a defendant's right to a question or instruction on mitigation turned on whether a settlement offer would have fully compensated the plaintiff. At the time when a trial court must decide whether to submit a mitigation question or instruction, there has not been a determination by the factfinder of the amount necessary to make the plaintiff whole. Therefore, it would be impossible in many cases for a court to determine if the settlement offer equaled or exceeded the plaintiff's damages.

■ In sum, we hold that when a defendant seeks a question or instruction regarding mitigation based on its own offer to a claimant, the defendant is entitled to that question or instruction only if the offer was clearly one for mitigation rather than settlement. We next consider whether any of Gunn Infiniti's offers to O'Byrne were of this nature.

## IV

■ At various times, Gunn Infiniti made four offers to O'Byrne. Gunn's sales manager confirmed in his testimony that all four offers were attempts to "settle with Mr. O'Byrne." O'Byrne similarly testified that each of these offers were offers to settle with him and that in some instances, he made counteroffers that were rejected by Gunn Infiniti. Gunn argues that the use of the words "settle" or "settlement" cannot be taken literally and that there is a fact question about whether any of its offers were for mitigation rather than for settlement purposes.

■ While the word "settle" can mean "different things in different connections," BLACK'S LAW DICTIONARY 1372 (6th ed.1990), it has a distinct connotation in the context of a dispute. When parties agree to settle their differences, this is commonly understood as fully resolving those differences. *See Herring v. Dunning,* 213 Ga.App. 695, 446 S.E.2d 199, 202 (1994); *Yancey v. Yancey,* 230 N.C. 719, 55 S.E.2d 468, 469 (1949) ("The word 'settle' means 'to place in a fixed or permanent condition; to determine. And the word being used in connection with litigation must be understood as signifying that the controversy had been adjusted and brought to an end." (citation omitted)); *see also C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 320 (Tex.1994) ("[W]e hold that 'settlement', as used in the Comparative Responsibility Law, means money or anything of value paid or promised to a claimant in consideration of potential liability."). As a Georgia Court of Appeals explained:

> "The word 'settle' has an established legal meaning and implies a mutual adjustment of accounts between different parties and an agreement upon the balance." In the case sub judice, plaintiff's "offer to settle" contained no express promise to release or discharge the defendant upon tender of the policy limits. Nevertheless, a promise to terminate the controversy or the litigation is a necessary implication to the "offer to settle." It is the quid pro quo. Indeed, that promise is the very definition of an "offer to settle."

*Herring,* 446 S.E.2d at 202 (citations omitted). Gunn Infiniti's offers implicitly if not explicitly required O'Byrne to release his claims. The trial court did not err in refusing to submit an instruction or question on mitigation, and retrial of the DTPA issue is not in order.

## V

■ The final issue that we must address is whether there is legally sufficient evidence to support a jury verdict on mental anguish damages. In *Parkway Co. v. Woodruff,* 901 S.W.2d 434 (Tex.1995), a DTPA case, we held that "an award of mental anguish damages will survive a legal sufficiency challenge when the plaintiffs have introduced direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine." *Id.* at 444. Courts should "closely scrutinize" awards of mental anguish damages. *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 54 (Tex.1997).

Evidence of O'Byrne's mental anguish comes largely from his following testimony:

> Since the day of purchasing the car and again after—I mean, it goes all the way back to college, graduating, getting out, getting the career started, getting on the right track, saving up enough money to buy a car, looking ahead to the future, this car was going to last me, I was told, a good five years. That this is a very reliable automobile. I was looking for performance. I was looking for appearance in the car. I was looking for reliability. I was looking for resale value. It all goes back to, I guess, what I was told that I was getting. What I did not get. I have a constant, a constant mental sensation of pain or a rude awakening. It's like a nightmare every time I see the car. It's parked underneath my garage at home. I have stopped driving the car. I probably have put maybe 5,000 miles on it within the last year. I get to the point to where I can't stand to be in the car. I noticed imperfections and I'm detail oriented, but this is obvious. You can see the discoloration of the hood doesn't match the fenders of the car. Imperfections on the air dam. You can see a chalky appearance. The unreliability again takes into consideration for a lot of anguish, a lot of grief. I have some severe disappointment both in myself and the dealership, my faith to ever do business again. I felt like I'm publicly humiliated. Yes, my friends do give me a lot of grief.

. . . .

My friends pick on me a lot. I had bragged about getting a new car. It was a major purchase for me. I had not purchased a home. This was my biggest purchase ever in my life. You know, they all told me, "You shouldn't buy the Infiniti. You shouldn't do that."

. . . .

Again, after putting up with ridicule from my friends, I feel embarrassed. I told my family, I told my friends what I was doing. I thought I was making a proper decision.

This is not legally sufficient evidence of mental anguish. It does not rise to the level of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Parkway,* 901 S.W.2d at 444 (citation omitted). Nor is there any evidence that there was a substantial disruption in O'Byrne's daily routine. *See id.*

Many of the feelings O'Byrne described were unrelated to Gunn Infiniti's DTPA violations. His testimony indicates that the grief he experienced from his friends was caused by the fact that he bought an Infiniti, not by Gunn's misrepresentations about this Infiniti. *See Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 817 (Tex.1997) (explaining that the consequential loss must be related to the misrepresentation). Further, O'Byrne's testimony about the car's reliability relates to the fact that the car had to be repaired for a number of defects unrelated to any of Gunn Infiniti's misrepresentations. The remaining testimony that O'Byrne offered to establish mental anguish is conclusory and does not present evidence of the nature, duration, or severity of his mental anguish. Simply because a plaintiff says he or she suffered mental anguish does not constitute evidence of the nature, duration, and severity of any mental anguish that is sufficient to show a substantial disruption of one's daily routine. While O'Byrne's dissatisfaction with this transaction is un-

derstandable, the evidence does not show that it rose to the level of compensable mental anguish. The trial court accordingly erred in awarding mental anguish damages.

The version of the DTPA that applies to this case limits O'Byrne's recovery for the violations found by the jury to three times his actual damages. *See* Act of May 29, 1989, 71st Leg., R.S., ch. 380, § 2, 1989 Tex. Gen. Laws 1490, 1491, *amended by* Act of May 19, 1995, 74th Leg., R.S., ch. 414, § 5, 1995 Tex. Gen. Laws 2988, 2992; *see also Jim Walter Homes, Inc. v. Valencia,* 690 S.W.2d 239, 241 (Tex.1985) (explaining how damages are calculated under the pre–1995 version of section 17.50(b)). Because there was no evidence to support O'Byrne's recovery of mental anguish damages, the jury's award of $50,000 in additional damages exceeded the statutory limits. Accordingly, we reform the award of DTPA damages to $31,500, which is three times O'Byrne's benefit-of-the-bargain damages of $10,500. We remand the DTPA claim to the court of appeals, however, to consider Gunn Infiniti's point of error as to the amount of attorney's fees under the DTPA. The court of appeals did not consider this issue because that court affirmed the damages awarded under the DTPA in their entirety. *See* 963 S.W.2d at 799.

We also remand O'Byrne's alternative fraud theory. Although the court of appeals has already considered the factual sufficiency of the evidence supporting the award of exemplary damages for fraud, we remand that issue for reconsideration in light of our elimination of mental anguish damages.[2] The court of appeals should determine the effect, if any, this reduction in actual damages has on the factual sufficiency of the evidence supporting the exemplary damages award. *See Southwestern Inv. Co. v. Neeley,* 452 S.W.2d 705, 707–08 (Tex.1970); *see also Tatum v. Preston Carter Co.,* 702 S.W.2d 186, 188 (Tex.

---

2. We note that Gunn Infiniti has not contended in the court of appeals or in this Court that

damages for fraud do not include mental anguish damages.

1986). After the court of appeals has resolved these remaining issues, O'Byrne will be entitled to elect his remedy under either the DTPA or common-law fraud.

\* \* \* \* \*

For the reasons considered above, we reverse the judgment of the court of appeals and remand this case to that court for further proceedings consistent with this opinion.

Justice BAKER filed a dissenting opinion.

Justice BAKER, dissenting.

Although I agree with the Court that O'Byrne did not proffer legally sufficient evidence of mental anguish in this case, I do not agree with the Court's disposition of the mitigation of damages issue. The Court holds that because Gunn's sales manager and O'Byrne used the word "settle" in testifying about Gunn's various offers to O'Byrne, Gunn's offers, as a matter of law, would have required O'Byrne to relinquish all his claims against Gunn. The majority concludes that, therefore, Gunn's offers do not warrant a jury question on mitigation. I disagree. I would reverse the court of appeals' judgment and remand for a new trial.

## I. APPLICABLE LAW

A trial court must submit questions, instructions, and definitions that the pleadings and evidence raise. See TEX.R. CIV. P. 278; Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex.1992). A trial court may refuse to submit a question only if no evidence exists to warrant its submission. See Elbaor, 845 S.W.2d at 243; Brown v. Goldstein, 685 S.W.2d 640, 641 (Tex.1985) (citing Garza v. Alviar, 395 S.W.2d 821, 824 (Tex. 1965)). If there is some evidence to support a jury question and the trial court does not submit the question, the trial court has committed reversible error. See Elbaor, 845 S.W.2d at 243; Moore v. Lillebo, 722 S.W.2d 683, 686 (Tex.1986). In determining whether a trial court should have submitted a question to the jury, the reviewing court must examine the record for evidence supporting submission of the question and ignore all evidence to the contrary. See Elbaor, 845 S.W.2d at 243. Conflicting evidence presents a fact question for the jury. See Brown, 685 S.W.2d at 641–42; Phillips Pipeline Co. v. Richardson, 680 S.W.2d 43, 48 (Tex.App.—El Paso 1984, no writ).

Mitigation, if raised by the evidence, is a fact question for the jury. See America W. Airlines, Inc. v. Tope, 935 S.W.2d 908, 915 (Tex.App.—El Paso 1996, no writ); Sorbus, Inc. v. UHW Corp., 855 S.W.2d 771, 775 (Tex.App.—El Paso 1993, writ denied). Whether a party failed to mitigate is determined according to the standard of ordinary care—what a reasonable person would have done under the same or similar circumstances. See Moulton v. Alamo Ambulance Serv., Inc., 414 S.W.2d 444, 447, 449 (Tex.1967); Sorbus, Inc., 855 S.W.2d at 775.

## II. ANALYSIS

There is evidence that Gunn made several offers to O'Byrne: (1) to take the car back and refund the purchase price and O'Byrne's transportation costs; (2) to exchange the car for a red one and give O'Byrne $1000; (3) to exchange the car for a slightly newer model and charge O'Byrne only for the additional equipment that came with the newer model; and (4) to ship the car to San Antonio for repainting. Gunn's general manager testified that Gunn's primary motivation in making these offers to O'Byrne was to "satisfy a somewhat dissatisfied customer." But O'Byrne did not accept any of these offers. Indeed, according to Gunn's general manager, O'Byrne responded to one of the offers by stating: "No that won't work. You made a mistake and you're going to pay big-time." Instead of accepting any of Gunn's offers, O'Byrne kept the car at least three years and drove it fifty thousand miles, even though he claims that merely looking at it caused him mental anguish.

The Court concludes that this evidence does not support a mitigation of damages question because, as a matter of law, Gunn's offers required O'Byrne to release his claims. The Court bases this conclusion on: (1) the fact that, on cross-examination, Gunn's sales manager responded "yes" to the question: "All four of these offers that you made were to settle with Mr. O'Byrne, correct, sir?" and (2) the fact that O'Byrne testified that the offers were "to settle." In focusing on this evidence, the majority ignores the proper scope of review. *See Elbaor*, 845 S.W.2d at 243 (holding that to determine whether legally sufficient evidence supports the submission of a jury question, the reviewing court must examine the record for evidence supporting the question and ignore all evidence to the contrary).

The Court also circumvents the standard of review by determining that what Gunn meant when it used the word "settle" to describe its offers to O'Byrne is a legal question. But what Gunn meant by its offers to O'Byrne is a disputed fact issue for the jury, not a legal issue for the Court to decide. *See Brown*, 685 S.W.2d at 641–42 (holding that a trial court improperly refused to submit issue of contributory negligence because evidence of improper lookout and failure to timely apply brakes was conflicting and presented a factual question for the jury). "Settle" is "a word of equivocal meaning; meaning different things in different connections, and the particular sense in which it is used may be explained by the context or circumstances." BLACKS LAW DICTIONARY 1372 (6th ed.1990). Therefore, what Gunn meant when it used the word "settle" to describe its offers to O'Byrne depends on the particular context and circumstances.

The cases the Court cites for the proposition that "settle" necessarily implies a release are distinguishable precisely because of their particular context and circumstances. In *Yancey v. Yancey*, the court held that an agreed order dismissing a pending case, based on a settlement, barred another trial on the same claims. *See Yancey v. Yancey*, 230 N.C. 719, 55 S.E.2d 468 (1949). The court held that "settle," as used in the trial court's dismissal judgment, meant that the controversy had ended. *See Yancey*, 55 S.E.2d at 469.

*Herring v. Dunning* similarly concerns settling claims during litigation. *See Herring v. Dunning*, 213 Ga.App. 695, 446 S.E.2d 199 (1994). The issue in *Herring* was whether an "offer to settle" an existing lawsuit "for the limits of liability coverage" was sufficiently definite to be capable of acceptance and to create a mutually binding and enforceable contract. *See Herring*, 446 S.E.2d at 202.

In *C & H Nationwide, Inc.*, we held that the word "settlement," as used in comparative responsibility law, means money or anything of value paid or promised to a claimant in consideration of potential liability. *See C & H Nationwide, Inc. v. Thompson*, 903 S.W.2d 315, 320 (Tex.1994). This holding was partly based on the fact that the Texas Civil Practice and Remedies Code defined "settling person" as "a person who at the time of submission has paid or promised to pay money or anything of monetary value to a claimant at any time in consideration of potential liability." TEX. CIV. PRAC. & REM.CODE § 33.011(5); *see C & H Nationwide*, 903 S.W.2d at 319.

Here, Gunn made offers to O'Byrne before O'Byrne filed suit, sent a DTPA notice, or hired a lawyer. The context and circumstances of Gunn's sales manager and O'Byrne using the word "settle" to describe Gunn's offers do not compel a legal conclusion that Gunn would require O'Byrne to release all his claims against Gunn.

## III. CONCLUSION

Because the evidence of Gunn's offers is some evidence that O'Byrne could have mitigated his damages, I would hold that the trial court erred in refusing to submit Gunn's proposed mitigation questions and instruction. This conclusion would require reversing the court of appeals' judgment

and remanding the cause to the trial court for a new trial. Because the Court holds to the contrary, I dissent.