# Supreme Court of Texas

No. 20-0309

City of Baytown,
*Petitioner*,

v.

Alan Schrock,
*Respondent*

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

**Argued October 27, 2021**

JUSTICE YOUNG, joined by Justice Lehrmann, Justice Blacklock, and Justice Busby, concurring.

Respondent Schrock invoked the Takings Clauses of both the United States and Texas Constitutions. As the Court notes, however, the arguments before us treat the two as substantively indistinguishable and address only the contours of the federal Takings Clause. We are thus left with just one question to answer: whether the challenged conduct constituted a taking under the Fifth Amendment. I join the Court's opinion and its judgment because I agree with the Court that no federally cognizable taking occurred here.

Whether the City's challenged actions (or other governmental actions like them) might constitute a taking under the Texas Constitution, therefore, remains an open question. This situation is not novel. Parties frequently litigate takings cases as if the two Takings Clauses were the same. For that reason (and maybe others), judicial opinions also sometimes have described the two clauses as if they were the same. I write separately today to emphasize one key point: They are *not* the same.

**I**

I find Justice Busby's observation in *Jim Olive Photography v. University of Houston* to be inescapably true. While our cases frequently emphasize the substantial similarities between how both constitutions protect citizens from takings, "the Texas Takings Clause provides broader protection in certain areas." 624 S.W.3d 764, 780 (Tex. 2021) (Busby, J., concurring). Specifically, "the Texas Constitution requires compensation for *more types of government action* than its federal counterpart," *id.* at 777 (emphasis added), because "the obvious textual differences between the clauses" unambiguously reflect our Framers' determination to protect more than the Fifth Amendment does*, id.* at 780.

The Fifth Amendment concludes this way: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Our State's Bill of Rights, by contrast, says this: "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation . . . ." Tex. Const. art. I, § 17(a) (then adding further restrictions). The Texas Constitution, in other words, says everything that the U.S. Constitution does, but makes

two significant additions. First, it adds the verbs "damaged, or destroyed" to "taken." Second, not content with predicating a taking on property being taken "for public use," our Constitution adds that it may also count as a taking if the property is "applied to public use."

Beyond these express textual differences, the historical development of our Constitution further establishes that the federal and Texas provisions are not coterminous. The Fifth Amendment's spare use of "taken" long antedated the drafting of our Constitution. Every Texas Constitution from 1836 to 1869 used only the verb "taken," just like the Fifth Amendment.[1] Sometimes the text of our Constitution and the U.S. Constitution align, as with the Texas Constitution's Contracts Clause (in the section of our Bill of Rights that immediately precedes the Takings Clause).[2] This Court found the alignment of the Contract Clauses to be significant. The meaning of the *federal* Contracts Clause was fixed by the time our 1876 Constitution was enacted, we observed; our Framers' decision to copy that language essentially verbatim meant that they had chosen to also accept that provision's settled meaning. *Travelers' Ins. Co. v. Marshall*, 76 S.W.2d 1007, 1023 (Tex. 1934). If

---

[1] Like its predecessors, the 1869 Constitution provided only that "no person's property shall be taken or applied to public use without just compensation being made, unless by the consent of such person." *Ft. Worth & R.G. Ry. Co. v. Jennings*, 13 S.W. 270, 270 (1890) (quoting Tex. Const. of 1869, art. I, § 14). *See also* Tex. Const. of 1866, art. I, § 14; Tex. Const. of 1861, art. I, § 14; Tex. Const. of 1845, art. I, § 14; Repub. Tex. Const. of 1836, Declaration of Rights, cl. 13. *See also Jim Olive Photography*, 624 S.W.3d at 780 (Busby, J., concurring) (noting case law that has acknowledged the textual differences).

[2] *Compare* U.S. Const. art. I, § 10 ("No State shall . . . pass any . . . Law impairing the Obligations of Contracts . . . .") *with* Tex. Const. art. I, § 16 ("No . . . law impairing the obligation of contracts, shall be made.").

anything, the Framers' decision to *add* "damaged, or destroyed" to the Texas takings guarantee in 1876 must be even *more* intentional.[3]

The additional language—especially "damaged, or destroyed"—seems potentially relevant to cases like this one. Schrock alleges that the City essentially held his property hostage by refusing to provide him access to utilities (a City monopoly) until he discharged the obligations of third parties. The denial of utilities arguably has the systematic and predictable effect of at least "damag[ing]" and possibly "destroy[ing]" the residential property. It may not quite be "your money or your life"—but "your money or your property" is still a powerful threat. *Comply with our demand*, in other words, or watch your property disintegrate because of our action.

A city making such demands would be acting for the public, too.

---

[3] Indeed, while the 1876 Constitution was still relatively young, this Court commented on the language added to Takings Clause:

> Under the provisions of other constitutions which merely provided compensation to the owner for property taken for public use, it had been a question whether or not one whose property was immediately and directly damaged by a public improvement, though no part of it was appropriated, could recover for such damage . . . . The insertion of the words 'damaged or destroyed' in the section [of the Constitution] quoted was doubtless intended to obviate this question, and to afford protection to the owner of property, by allowing him compensation, when by the construction of a public work his property was directly damaged or destroyed, although no part of it was actually appropriated.

*Trinity & S. Ry. Co. v. Meadows*, 11 S.W. 145, 145–46 (Tex. 1889); *see also DuPuy v. City of Waco*, 396 S.W.2d 103, 108 (Tex. 1965) ("It was the injustice of requiring an actual taking which explains the inclusion for the first time in the Constitution of 1876 of the requirement that compensation be paid for the damaging of property for public use.").

"Persuading" someone to pay a third party's debt to the public clearly advantages the public fisc. The City also concedes that its ordinance was a violation of state law all along. The legislature forbade municipalities from conditioning access to utilities on the payment of other people's debts. Tex. Loc. Gov't Code § 552.0025. Perhaps the legislature did so from a sense of fairness. But also—just perhaps—it sought to prevent local governments from sliding into takings.

Had the Texas Constitution been presented as an alternative rather than duplicative source of law, today's case may have turned out differently. Or maybe not. We cannot know for sure until we have a case like this one that includes arguments tailored to our *state* constitutional law. It is clearly true that the Texas Takings Clause is broader than the federal Takings Clause—but how much broader, and under what circumstances?

We cannot meaningfully answer those questions unless litigants undertake substantial additional work beyond invoking federal takings doctrines. To analyze a Texas constitutional claim, we would need comprehensive briefing from the parties (and, I would hope, from amici) on the precise scope of the right to compensation that the *Texas* Constitution affords. Antecedent questions concerning the nature of the property interests at issue, and whether they can support a claim under our Constitution, also would likely require careful attention.

But here, just as Justice Busby observed in *Jim Olive Photography*, the absence of any "conten[tion] that the [takings] analysis should be any different under the Texas Constitution" means that this Court cannot proceed. 624 S.W.3d at 782. Like the plaintiff in *Jim Olive*

5

*Photography*, Schrock noted only that Texas's "takings case law is consistent with federal jurisprudence," then treated the two Takings Clauses as indistinguishable. This pattern is almost routine. Despite this Court's recognition of differences between the two Takings Clauses, the distinction often goes undrawn. When that happens, the Court loses any basis to assess whether any material distinction exists between the two Takings Clauses under the facts of that case.[4] Indeed, in *City of Houston v. Carlson*, 451 S.W.3d 828 (Tex. 2014), which plays a significant role in today's decision, it likewise appears that the plaintiffs treated the federal and state takings claims as identical. So, therefore, did the Court. *See id.* at 831 (citing *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 477 (Tex. 2012), for the proposition that Texas takings jurisprudence is consistent with federal jurisprudence).

As Chief Judge Sutton has put it, all too often lawyers "rais[e] the federal claims and rarely address[] in any detail, if . . . at all, a counterpart state constitutional claim. State judges referee the game. They do not play it, and they thus cannot rely on state constitutional grounds never raised." Jeffrey S. Sutton, *Who Decides?: States as Laboratories of Constitutional Experimentation* 128–29 (2022). In an appropriate case, a party may well show that the Texas Constitution requires compensation in circumstances in which the United States Constitution does not.

---

[4] *See, e.g.*, *Jim Olive Photography*, 624 S.W.3d at 771; *City of Dallas v. VSC, LLC*, 347 S.W.3d 231, 234 n.3 (Tex. 2011); *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 669 (Tex. 2004).

**II**

One remaining question is also bound up with a takings claim under the Texas Constitution: how a plaintiff's actions may play a role in reducing or forestalling any takings liability. If future cases confirm that the Texas Constitution's broader scope is more than *de minimis*, the plaintiff's ability to mitigate property damage, or even avoid it altogether, may prove to be a key part of the analysis. Said differently, courts must give the Texas Takings Clause its full scope—and if that scope turns out to be substantial, the elements of damages and causation may be important to prevent an unintentional Takingsization of the rest of the law. Nearly any complaint about governmental action can be contorted into *some* allegation of a taking. Rigorous and serious requirements for establishing causation and damages will ensure that worthy claims, but *only* worthy claims, will both proceed and merit full compensation.

As with the question of whether the City's conduct would qualify as a taking under the Texas Constitution in the first place, however, we likewise lack briefing and analysis concerning these important subsidiary questions. Today, of course, they do not matter. Nothing turns on whether Schrock's own behavior might require reducing his damages, terminating his claim on causation grounds, or having any other effect. His federal claim could not proceed either way. But tomorrow may bring a different case—a case in which the Texas Takings Clause may do independent work. Future litigants in cases like that will need to address the contours of our state constitutional text *and* the consequences (if any) of a plaintiff's own conduct on a takings claim's

viability and remedy.

Our law, after all, recognizes several avenues to limit or preclude damages because of a plaintiff's conduct. For example, a plaintiff at fault for her own injury may have her damages reduced or foreclosed under comparative fault. *See* Tex. Civ. Prac. & Rem. Code §§ 33.001–33.002, 33.012; *Del Lago Partners, Inc v. Smith*, 307 S.W.3d 762, 772 (Tex. 2010) (discussing the adoption of the statutory proportionate responsibility regime). In some contexts, plaintiffs may have a duty to mitigate damages and may be barred from recovering whatever damages could have been prevented with care or reasonable effort. *See, e.g.*, *JCB, Inc. v. Horsburgh & Scott Co.*, 597 S.W.3d 481, 486–87, 486 n.3 (Tex. 2019) (duty to mitigate damages in contract after breach of contract); *J & D Towing, LLC v. Am. Alt. Ins. Co.*, 478 S.W.3d 649, 677 (Tex. 2016) (duty to mitigate damages in personal property tort); *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 858 (Tex. 1999) (duty to mitigate damages in a Deceptive Trade Practices Act case); *Moulton v. Alamo Ambulance Serv., Inc.*, 414 S.W.2d 444, 449 (Tex. 1967) (duty to mitigate damages in personal injury tort). We have not been able to explore the extent to which these concepts, or others related to them, may interact in the context of a Texas takings claim.

Relatedly, the doctrines of causation may limit a plaintiff's recovery. This Court has previously said, for example, "[p]roximate cause is an essential element of a takings case." *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 483 (Tex. 2012). Part of the "true test" in discerning liability for a taking of property, we have held, is whether the government's acts "were the proximate cause of the taking or damaging of

such property." *State v. Hale*, 146 S.W.2d 731, 736 (Tex. 1941). Moreover, the question of "causation is an issue to be considered by [c]ourts in takings cases." *Hearts Bluff Game Ranch*, 381 S.W.3d at 482. For an inverse condemnation claim, the governmental entity sued must have been the proximate cause of the harm to property rights. *Id.* at 483–84.[5]

How might a plaintiff's *own* conduct fit within this rubric? "[T]he term proximate cause is generally defined as meaning 'that cause which, in natural and continuous sequence, unbroken by any new and independent cause, produces the injury, and without which the result would not have occurred.'" *Young v. Massey*, 101 S.W.2d 809, 810 (Tex. 1937). A "new and independent, or superseding, cause may intervene between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause." *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016) (internal quotation and punctuation omitted). The new cause "thus destroys any causal connection" between the original wrong and the harm. *Id.* But we have not addressed, and absent full briefing and argument cannot resolve, whether a taking can be said to be proximately caused by the defendant if the property owner—that is, the plaintiff, not some new entrant onto the scene—has failed to use objectively reasonable and

---

[5] "Causation is one of several threshold conditions that must be met before the merits of a takings case will even be considered." Jan G. Laitos & Teresa Helms Abel, *The Role of Causation When Determining the Proper Defendant in a Takings Lawsuit*, 20 Wm. & Mary Bill Rts. J. 1181, 1191 (2012). Causation, in this context, "requires that the defendant be a government actor responsible for the harm alleged to be the taking of the private property interest." *Id.* Causation problems "commonly arise" when "there may have been a government act, but the plaintiff's own decisions may have been responsible for the injury." *Id.* at 1200–01.

available efforts that would preclude property damage in the eminent-domain context. Future cases may turn on the law of causation more generally—whether proximate cause or otherwise—and both plaintiffs and defendants should be ready to make arguments about how these doctrines affect takings claims.

The record in this case at least illustrates the kind of facts that might trigger analysis relevant to the development of our jurisprudence on damages, causation, or both. Schrock is a landlord, and this Court long has held that a "landlord's duty to mitigate requires the landlord to use objectively reasonable efforts to fill the premises when the tenant vacates in breach of the lease." *Austin Hill Country Realty, Inc. v. Palisades Plaza, Inc.*, 948 S.W.2d 293, 299 (Tex. 1997). Similarly, a landowner "owe[s] the duty to use ordinary care to mitigate his damages" proximately caused by a defendant's obstruction of highway access. *Tex. & P. Ry. Co. v. Mercer*, 90 S.W.2d 557, 560 (Tex. [Comm'n Op.] 1936). Refusing to take reasonable efforts to avoid a loss of property rights or property damage may reduce the compensation owed or even block a claim that the government's action caused the taking or damage of such property. The Federal Circuit has found that a lessor's failure to mitigate barred any regulatory-takings claim. *See, e.g.*, *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1584 (Fed. Cir. 1995). The extent to which Texas law takes a similar view remains an open question.

Even if the City's conduct could qualify as a taking under the Texas Constitution, therefore, it is at least plausible that the City's liability would be substantially reduced or completely eliminated by Schrock's actions and inactions. Schrock was no stranger to leasing property in

Baytown.[6]  By the time the utility dispute arose, Schrock had at least thirty-five other rental houses in the City.  Nevertheless, Schrock failed to avail himself of the City's readily available mechanism to forestall any interference with his property rights because of a third party's debt.[7] He neglected to file a declaration with the City stating that the property here was rental property until after he received notice of the delinquent utility bills in 2009—and after he unsuccessfully challenged the City's enforcement action.[8]  By all appearances, he easily could have avoided any harm to his property from the City's actions, but instead allowed a utility-bill grievance to deprive him of use of his rental property.[9]

---

[6] Schrock even testified to his familiarity with the requirements of being a Baytown landlord.  His investment strategy was to buy three houses in the area annually until he turned sixty-five.  He planned to then start selling the houses to meet his cash needs for the remainder of his life.

[7] Schrock rented the mobile home on this property to lower-income tenants since he purchased it in 1993.  Although the City's ordinance authorized the City to put a lien on a landlord's property and deny utility services if a tenant failed to pay utility bills, the ordinance provided a landlord a way to avoid such consequences: a landlord could preemptively file "with the city utility billing division a declaration in writing specifically naming the service address of the property and declaring such to be a rental property."  Such a declaration would "prevent the city from using that [rental] property as security for the water, sewer and garbage collection services" and would prevent the City "from filing any lien on such property . . . ."  *For over fifteen years*, Schrock neglected to file the declaration contemplated by the City's ordinance.

[8] Indeed, one of the reasons that Schrock's challenge failed was that Schrock had "no rental declaration on file for the time period in question declaring that Mr. Schrock does not wish the property to be used as security for the utility service charges for services to the property."  Not until after Schrock received the City's second notice did he file the declaration contemplated by the City's ordinance.

[9] Schrock's claim that he did not know about the option to file a declaration would not automatically excuse him from filing one—especially

11

In any event, Schrock had even more opportunities to avoid any loss of property rights or harm to his property. In March 2009, the City notified Schrock that it would seek to impose a lien on his property if he did not pay the outstanding utility bills by a certain date. Schrock contested the outstanding bills, participating in the City's hearing process. Following the hearing, the City sent Schrock a second notice which reduced the amount of payment demanded but informed Schrock that he had fourteen days to pay before a lien would be imposed. He decided not to pay, at least not immediately. He could have paid "under protest," which would have prevented the lien. Indeed, Schrock *intended* to do so for several months after the lien was imposed. When he eventually visited the City's water department with a check to pay the original amount of the outstanding bill—with "[p]aid under protest" written in the memo line—a clerk informed Schrock of an additional unpaid bill. Because Schrock only had one check with him, which he had already filled out, Schrock left without paying anything. Seven months later, he returned to the City's water department, but *again* declined to pay, this time out of concern that he might face more delinquent bills for his other rental properties. Thus, rather than pay the delinquent utilities bill under protest and seek a refund—which would have allowed Schrock to rent the property for approximately $600 a month—Schrock allowed his property to languish in a state of increasing disrepair over less than $1,500 in dispute.

---

when it is undisputed that he purchased this property for the express purpose of renting it and owned it as part of a portfolio of rental properties. *See, e.g.*, *Allstate Ins. Co. v. King*, 444 S.W.2d 602, 605 (Tex. 1969) (ignorance of a filing requirement will not excuse failure to comply).

*Even that* is not all. Schrock also knew that he could have asked the City to reinstate utility services. *He actually did so* in April 2012 when he asked the City to turn on water service so he could work on mold and rat problems on the property. *Schrock himself* then asked the City to turn the water service *off* a month later. And when the City removed the lien in 2013, Schrock did not ask the City to turn on municipal utility services so that he could restore the property and begin renting it again. Instead, Schrock has continued to let his property sit vacant.

Schrock was free to behave as he saw fit, of course. But whether and to what extent his actions may be laid at the City's door is a different matter. It is true that the City's own (unlawful) actions played a role. Its improper denial of water service to a tenant in 2009 and the improper lien were certainly but-for causes of some damage.[10] Given a full review of the factual circumstances here, however, Schrock had the keys to free his property from the City's shackles but refused to use them. Schrock likely could have avoided any restriction of his property rights—by filing the appropriate declaration before renting his property, paying the utility bill under protest, or asking the City to restore utility services. He chose not to. It may well be that a plaintiff situated like Schrock would only be entitled to reduced compensation or alternatively would be barred from establishing any takings claim at all.

To be clear, however, I do not resolve the role that a plaintiff's actions play in the assessment of the damages or causation elements. I

---

[10] Again, Schrock could have filed a declaration and avoided any effort by the City to use his property as security for the unpaid utility bills of third parties.

13

do not rely on any such analysis for my vote in this case. But the strong possibility that Schrock played a considerable part in his own property damage confirms my confidence in the Court's bottom-line judgment. It likewise confirms my sense that in future cases—*especially* cases in which plaintiffs assert a claim that may be viable under *only* the *Texas* Takings Clause—courts and parties should carefully address the nuances of damages and causation, not just whether the challenged governmental conduct, standing alone, would qualify as a taking.[11]

\* \* \*

With these observations, I am pleased to join the Court's opinion and its judgment.

Evan A. Young
Justice

**OPINION DELIVERED:** May 13, 2022

---

[11] Indeed, to the extent that these inquiries may in some cases preclude the need to resolve whether novel and complex circumstances even qualify as a taking under our Constitution, they would serve the values of the constitutional-avoidance canon. As this Court has recognized, "[c]ases attempting to decide when a regulation becomes a taking are among the most litigated and perplexing in current law," terming these legal battlefields "a sophistic Miltonian Serbonian Bog." *Sheffield Dev. Co.*, 140 S.W.3d at 671 (quotations omitted).