In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-13-00413-CV

_____

**NATIONAL LLOYDS INSURANCE COMPANY, Appellant**

**V.**

**LATOSHA A. LEWIS,**
**Appellee**

**On Appeal from the 60th District Court**
**Jefferson County, Texas**
**Trial Cause No. B-188,072**

**MEMORANDUM OPINION**

National Lloyds Insurance Company ("Lloyds") appeals the trial court's
judgment in favor of Latosha A. Lewis following a jury trial. In seven appellate
issues, Lloyds challenges (1) the legal sufficiency of the evidence supporting the
jury's findings regarding causation, damages for mental anguish, breach of
contract, and breach of the DTPA, and exemplary damages, (2) the trial court's
inclusion in the charge of an instruction regarding waiver and its refusal to include

1

an instruction on spoliation, (3) and the trial court's rendition of a judgment that allegedly failed to force Lewis to make an election of remedies. We affirm the trial court's judgment as modified.

## PROCEDURAL BACKGROUND

Lewis[1] sued Lloyds, alleging that when Hurricane Ike occurred in 2008, her home in Beaumont was covered by a policy from Lloyds. According to Lewis, her home and personal property were seriously damaged by the storm, and she also incurred additional living expenses. Lewis asserted that Lloyds wrongfully denied her claim for repairs of the property, despite the fact that her policy provided coverage for such losses, and underpaid some of her claims. In addition, Lewis contended that all conditions precedent for her to recover under the policy had been satisfied. Lewis asserted causes of action for breach of contract, DTPA violations, unfair insurance practices, breach of the duty of good faith and fair dealing, and fraud. Lewis sought economic damages, as well as damages for mental anguish, treble damages pursuant to the DTPA and the Texas Insurance Code, exemplary damages, and attorney's fees.

---

[1]Lewis married and changed her last name to "James" after purchasing her home. We will refer to appellee throughout as "Lewis."

## THE EVIDENCE

At trial, Lloyds's corporate representative, Paul Boswell, testified that Lewis's policy provided coverage for her dwelling in the amount of $54,000 and an additional $5000 coverage for incurred expenses. Boswell testified that Lloyds did not exclude Lewis's roof from coverage when Lloyds decided to cover Lewis's house, nor did Lloyds inform Lewis that it would not cover the roof unless she repaired any damage. Boswell explained that in 2005, after Hurricane Rita, Lloyds paid Lewis for new shingles, but did not pay to replace the decking, and Lloyds's adjuster did not see any structural problems with the roof. According to Boswell, Lloyds found no evidence during its investigation of Lewis's Hurricane Rita claim that the structure of the roof was compromised. Boswell also testified that when Hurricane Humberto struck approximately two years later, Lloyds found no evidence of interior water damage to the home.

Boswell testified that selling actual cash value (ACV) policies "to insure people with lower valued homes and people with lower levels of education" is one of Lloyds's "main markets[.]" After Hurricane Rita damaged Lewis's home, Lloyd's paid (pursuant to Lewis's ACV policy) $3,884.86. Boswell testified that Lloyds neither instructed Lewis concerning how to use the money paid for her Hurricane Rita claim, nor informed Lewis that future claims would be barred if she

3

did not replace the roof. Lloyds never refused to cover the roof when the policy renewed annually. Boswell did not believe that Lloyds required Lewis to obtain a windstorm certificate for her roof.

Boswell explained that Lewis's policy required her to make reasonable and necessary repairs to protect the property. Lloyds took the position that Lewis failed to protect the property and mitigate her damages as required by the policy, and that the problem with the roof after Hurricane Ike struck had existed since Hurricane Rita. According to Boswell, Lloyds did not pay any money to Lewis for evacuation expenses or living expenses because Lloyds determined that Lewis's home was not completely uninhabitable after Hurricane Ike.

Boswell testified that at Lewis's request, Lloyds wrote a letter to FEMA stating that Lloyds denied coverage because the home was not completely uninhabitable; however, Lewis's policy did not require that her home be wholly uninhabitable to make a claim. Boswell admitted that the letters Lloyds sent to Lewis about the denial of her claim "could have been better" and probably did not comply with Lloyds's obligation to give Lewis its reasons for denying her claim. When asked whether Lewis's policy contained any language requiring her to replace her entire roof after receiving an insurance payment, Boswell testified, "[t]hat exact language is not in the policy." According to Boswell, an email from

4

claims processor Nathan Rendo and the inspection performed by adjuster Brian Zepeda are the only documents in Lloyds's file that document the investigation of Lewis's Hurricane Ike claim. Boswell testified that he has no criticisms of Zepeda's work with respect to the investigation and adjustment of Lewis's Hurricane Ike claim.

Zepeda, the independent adjuster who inspected Lewis's home after Hurricane Ike, testified that he reported to Lloyds that storm winds from Hurricane Ike "caused wind damage to the roofing shingles on the rear slope and produced a storm-created opening allowing water intrusion to the interior." Zepeda testified that the roof damage to which he referred had not been present after Hurricane Humberto. Zepeda distinguished damage caused by Hurricane Humberto from that caused by Hurricane Ike by inspecting photographs and comparing them with what he saw in person. Zepeda testified that he removed roofing from his estimate and issued a new report pursuant to Rendo's email which stated, "Please remove the roofing from the estimate. It was paid in 2005 and never replaced."

Lewis testified that she purchased this house for $54,000.00 in 2003 when she was twenty-three or twenty-four years old. Lewis obtained insurance for the property from Lloyds. Hurricane Rita damaged Lewis's home, and she filed a claim with Lloyds. Lewis explained that the master bedroom sustained water

5

damage, and the shingles on the roof were damaged. Lewis testified that her son's bedroom did not sustain water damage after Hurricane Rita.

Lloyds paid Lewis's Hurricane Rita claim in January 2006. Lewis testified that she received $5300, and she made repairs with that money and also used it to purchase a $500 generator, as well as for her evacuation expenses. She spent "the majority of it" on repairing her roof. Lewis testified that she was never paid for damage to gutters, fascia, or soffits after Hurricane Rita. According to Lewis, the checks from Lloyds did not come with any letters telling her what losses the payments were covering, and no one from Lloyds told her that she needed to replace her entire roof with the money she received. When asked why she did not replace the entire roof after Hurricane Rita, Lewis testified, "I didn't have enough money to replace my roof. I had people stopping by giving estimates . . . , but their estimates were way too high. So, we had to repair it. We couldn't just let it sit." Lewis explained that after she repaired the roof, the roof did not leak until Hurricane Ike struck. Lewis explained that no leaking occurred in her son's bedroom before Hurricane Ike.

When Hurricane Humberto struck, a tree limb hit Lewis's home, damaging the gutter and electrical lines, soffit, and fascia, and she filed a claim with Lloyds. Lewis testified that no water damage occurred as a result of Hurricane Humberto.

Lloyds denied Lewis's claim in a letter which stated, "Our inspection revealed old damage to your dwelling roof. We paid to replace the same roof damage during Hurricane Rita . . . . It appears that the roof has never been replaced. So, no additional payment is warranted for the roof." According to Lewis, when Lloyds renewed her policy each year, Lloyds never excluded her roof from coverage or told her that she could not file a claim for damage to the roof unless she replaced it.

When Hurricane Ike struck, Lewis evacuated for approximately two weeks, and she estimated that she incurred $200 to $300 of additional expenses. Lewis testified that after Hurricane Ike, the roof over her son's bedroom caved in, and sheetrock was "everywhere, all over." In addition, Lewis testified that a tree was on the roof over her son's room and a tree had come through the window. Lewis explained that when she and her family returned to the home, she closed the room off and put a towel under the door in an attempt to prevent fumes from the mold from escaping. Lewis testified that Lloyds did not pay for any of the damaged belongings in the room, which totaled $1210. Lewis testified that the coverage limitation on her policy was $54,000. According to Lewis, no one from Lloyds ever talked with her about her policy.

Lewis explained that Zepeda's notation while adjusting her Hurricane Ike claim that she "confirmed that the repairs have not been completed" after

7

Hurricane Rita is false because she did make repairs. Lewis testified that she was unaware that Zepeda had recommended that Lloyds pay her Hurricane Ike claim in the amount of $7,466.99, but that Lloyds claimed that no payment was due. Lewis testified that she called Lloyds several times after Zepeda's visit, but no one ever returned her calls. She then sought assistance from the Texas Department of Insurance and FEMA. Lewis filed a complaint against Lloyds, and she testified, "I got a response that day. . . . They contacted T.D.I., and they also contacted FEMA." Lewis testified that the letter response Lloyds faxed to the Texas Department of Insurance said (1) "the insurance claim was denied[,]" (2) Lloyds's inspection revealed old damage, and (3) Lloyds had paid to replace the roof after Hurricane Rita. Lloyds's letter did not allege that Lewis failed to make reasonable repairs or to protect her property from further damage. Lloyds never paid Lewis for the damages to her home from Hurricane Ike. According to Lewis, although some mold was present in the home after Hurricane Rita, that damage was successfully repaired, and the home did not develop a significant mold problem until after Hurricane Ike.

Lewis's husband, Herbert James, Jr., testified that he and his stepfather-in-law repaired the roof after Hurricane Rita, when the roof above the master bedroom was damaged. According to James, after the Hurricane Rita repairs, no

8

water got into the house until Hurricane Ike, when the area of the roof above his son's room was damaged by a tree. James explained that there were no water leaks in his son's bedroom before Hurricane Ike. After Hurricane Ike, James removed the tree and repaired the roof by installing rolled roofing.

Rendo testified that he received his license as an insurance adjuster in 2006. When Hurricane Ike struck, Rendo was working from his home as an independent contractor associated with Wardlaw Claims Service. Rendo was asked to help review files at Lloyds's offices approximately one month after Hurricane Ike. Rendo testified that his job title was "claims processor[,]" and his job was to "help them get files paid." Rendo explained that he also made coverage decisions, and he was familiar with Lloyds's insurance policy covering Lewis's house. Lloyds provided Rendo a copy of the policy via its claim system, and Rendo also reviewed the files on Lewis's claims for Hurricanes Rita and Humberto. According to Rendo, no one from Lloyds ever gave him claims handling guidelines or provided feedback. Rendo did not recall speaking with Zepeda, a Lloyd's employee, or anyone else concerning Lewis's claim.

Rendo testified that he did not specifically recall writing the email to Zepeda, in which he instructed Zepeda to remove roofing from the estimate because "[i]t was paid in '05 and never replaced." Rendo testified that Zepeda had

9

used the word "new" three times to describe Lewis's Hurricane Ike damages. After Rendo reviewed the photographs in the claims files regarding Lewis's damages from Hurricanes Rita and Humberto, he concluded that the roof had been allowed for replacement after Hurricane Rita, but the roof had not been replaced at the time of Humberto or Ike, so he recommended that roof damages be removed from the estimate. Rendo testified that no rule required an insured to spend money received from a claim precisely in accordance with the way the insurance company had adjusted the claim. According to Rendo, an insurance company could refuse to cover the property any longer, or could exclude the roof from coverage.

Rendo testified that Lewis was not paid for interior damage sustained from Hurricane Ike "[b]ecause she had not replaced her roof from her prior Hurricane Rita claim." According to Rendo, Hurricane Rita damaged Lewis's roof "past the point where it could be effectively repaired, which is why it was allowed for replacement." Rendo stated that Lewis did make what he characterized as "temporary repairs" after Hurricane Rita. Rendo testified that the photographs show new damage to the roof that did not exist prior to Hurricane Ike. Rendo eventually testified that Lewis failed to comply with the provision of her policy requiring her to protect the property from further damage, but conceded that this provision did not require her to replace the roof. Rendo also stated that Lewis's

policy required her to make reasonable and necessary repairs to protect the property, but he conceded that this provision of her policy does not mandate replacement of the damaged areas.

Licensed engineer Charles Norman testified that he holds a Bachelor of Science degree in engineering and a Master of Science degree in engineering science, and he has served as an engineering professor at McNeese State University. He also taught at Lamar while enrolled in a doctoral program. Norman is licensed as a professional engineer in Texas and Louisiana. Norman explained that he also does forensic engineering work, which involves using engineering principles to determine the cause of a particular incident or situation. Norman has published papers on forensic engineering "to the Forensic Engineering Institute on methodology, particularly in hurricane-damaged homes." He estimated that he has worked on thousands of hurricane damage cases during the last forty-five years, and he has testified in court thirty to forty times. Norman explained that the court accepted him as an expert in each of the prior cases in which he had testified. Norman is a member of the American Society of Civil Engineers ("ASCE"), and he has published several peer-reviewed papers through that organization. Norman is also a graduate of FEMA's Wind Engineering, Earthquake, Fire and Flood

Design Institute, and he explained that this FEMA program included training about conducting inspections and "making an evaluation of what's damaged."

According to Norman, forensic engineers use particular standards to determine how much wind or force is required to cause certain types of destruction to components of buildings, as well as building failures. Norman explained that ASCE standards set forth in "ASCE 7" contain minimum design loads for buildings and other structures, and Norman described ASCE 7 as "a very excellent standard that we use to design things -- design homes, buildings, structures -- and we also use to analyze failures." Norman testified that ASCE 7 is readily accepted and relied upon by engineers in his field. Norman also identified American National Standard Institute ("ANSI") "S500" as pertinent to Lewis's case, and he explained that S500 is "an excellent standard that guides us, based on engineering principles, on how we assess water damage to a home from a hurricane, from water leak, and so forth." According to Norman, engineers readily accept ANSI S500 and consider it authoritative. Lloyds's counsel did not object when Lewis's counsel offered Norman "as an expert in damage causation and engineering forensics."

Norman testified that in analyzing the damage to Lewis's home, he utilized the ASCE-07, ANSI 500, ASCI, and a causation method known as "root cause analysis[.]" Norman explained that he reviewed the claim files on Lewis's property

12

from Hurricanes Rita, Humberto, and Ike, as well as inspection reports from Lewis's mortgage Lender, Wells Fargo, documents from engineer Matt Oestrike of Nelson Engineering, and photographs and reports from Gary Wiener, who testified as an expert in construction and damage estimation. Norman also spoke with Lewis, Lewis's next door neighbor, and Wiener. In addition, Norman reviewed and relied upon deposition transcripts and official tropical cyclone reports from the National Hurricane Center for Hurricanes Rita, Humberto, and Ike.

Norman testified that the hole in the decking of Lewis's roof was consistent with a tree limb impact because it is "some sort of a puncture, . . . [a] dynamic impact." According to Norman, the hole was associated with "water entry[,]" and he characterized the hole as "a smaller area of impact loading" and ruled out rot and deterioration as causes. Norman opined that the amount of force necessary to create such a hole in the decking "would be in the realm of 3,000 pounds[,]" and explained that it would be "like a tree limb, something that size." Norman testified that it was reasonable to conclude that rolled roofing was applied over the hole after Hurricane Ike.

According to Norman, the damage to Lewis's home was caused by wind and water intrusion through the hole as a result of Hurricane Ike. Norman testified that nothing in the Wells Fargo inspection documents suggested that a hole was present

in the decking, and the Wells Fargo inspection indicated that there was no collapsed sheetrock. Norman testified that, in his opinion, the damage to Lewis's roof was caused by Hurricane Ike.

Norman also testified that the damages he attributed to Hurricane Ike are consistent with the wind load analysis testing he did of Lewis's house. In addition, Norman explained that the cracks depicted in the post-Hurricane Ike photographs were at the ceiling or high up on the walls, which "suggests and indicates and supports that the house moved from vibration due to wind" rather from movement of the slab. Norman testified that his own roof endured four hurricanes before he replaced the entire roof. According to Norman, "[i]f a repair to a roof suffices to keep the water shed and water from coming in, it's a complete repair." Norman opined that the post-Hurricane Rita repairs made to Lewis's roof probably held up after Hurricane Humberto because "there were no leaks after Humberto." Norman explained that if Lewis had the money to repair the back slope of the roof after Hurricane Ike and "done the repairs associated with the interior water damage[,] . . . she could have mitigated enough damage that it would have prevented this house from being . . . a constructive total loss[;]" that is, the cost of repairing the home would not have been near or exceeding the value of the entire house. According to

14

Norman, Providence Engineering, L.L.C.'s[2] repair cost estimate to mitigate the damage to Lewis's home, bring it up to livable standards, and satisfy the upgrade requirements was $156,155.49. Norman agreed with Providence Engineering's assessment that Lewis's home was a constructive total loss. According to Norman, Lloyds failed to follow protocols and industry standards applicable to its assessment of the insulation, ceilings, wood flooring, and HVAC system in Lewis's home.

Wiener testified that he has worked in the construction business for over thirty-five years and is licensed as a general contractor in Michigan and Louisiana. In approximately 2000, Wiener became a premier service contractor for State Farm Insurance, which led him to become involved in "heavier, bigger restoration projects." State Farm required Wiener to use an estimating software called Xactimate, and Wiener estimated that he has prepared "well over 400" estimates using Xactimate. Wiener testified that he is familiar with contractors "from Lake Charles to contractors over on this side of Texas." Lloyds did not object when Lewis offered Wiener as "an expert in construction and damage estimation."

Wiener inspected Lewis's home in November 2010, took dimensions and photographs of the property, and generated a report using Xactimate. Wiener

_____

[2]Southeast Texas Regional Planning Commission retained Providence Engineering, L.L.C. to evaluate Lewis's home.

explained that when he prepared his initial report, he was unaware that Lewis had claims for Hurricanes Humberto and Rita. After learning of the additional storms, Wiener prepared three additional reports that broke the original estimate "into three estimates, which were Hurricane Rita, Humberto, and Ike." Wiener testified that he and Norman worked together to distinguish the damages by reviewing "a bunch of documents and photographs." According to Wiener, he and Norman determined that, with the necessary code upgrades, the replacement cost of the damages to Lewis's home from Hurricane Ike was $62,998.07, and he explained that he calculated depreciation in the amount of $3360.87, for an actual cash value of $59,637.20. Wiener testified that the actual cash value without including upgrades to bring the home up to code is $34,640.38.

Phil Spotts, Lewis's expert witness with respect to claims handling and investigation, testified that he became an insurance claims adjuster in 1978 or early 1979, and he holds the designation of C.P.C.U. (Chartered Property and Casualty Underwriter), which is "considered to be the highest designation . . . from the Insurance Institute of America." Spotts testified that he also holds the Insurance Institute of America designations of Associate in Risk Management and Associate in Claims. Spotts is certified by the National Flood Insurance Program and the Texas Catastrophe Property Insurance Association. Spotts became manager of the

16

General Adjustment Bureau office in Beaumont in the early 1980s, and he handled both residential and commercial claims and trained and supervised adjusters. Spotts testified that he has been involved in adjusting insurance claims from eighteen hurricanes, and he estimated that he has worked on at least 15,000 residential hurricane claims.

Spotts explained that when adjusting claims, adjusters must be cognizant of what the policy provides, what laws govern the handling of claims, and orders from the Texas Department of Insurance. Spotts testified that he is familiar with the Texas Insurance Code, which governs how claims are handled and how insurance companies should handle, investigate, and pay claims.

Spotts testified that he reviewed Zepeda's reports, the entire claim file, estimates, engineering reports, and some depositions. Spotts reviewed the claims files from all three of Lewis's hurricane claims. Spotts explained that two adjusters were involved with Lewis's Hurricane Ike claim: the field adjuster, Zepeda, and the adjuster at Lloyds, Rendo. According to Spotts, "Mr. Zepeda can't do his job without knowing the coverage when he goes out there or else he won't know what to put in the estimate. He won't know what questions to ask. Mr. Rendo has got to know the coverage because he . . . was making the ultimate decision as to what was gonna be paid and what wasn't gonna be paid." Spotts testified that Rendo did not

state anywhere in the file what documents he was relying on in making the coverage determination. In addition, Spotts testified that Zepeda had never handled a claim before Hurricane Ike and did not have an adjuster's license, so Spotts was "concerned about that right off the bat." Spotts explained that anyone "can send $20 to the Texas Department of Insurance after a catastrophe and be an emergency claims adjuster."

Spotts testified that Lewis's claim was not simple, and he believed Rendo and Zepeda did not have "enough experience to know what to do to properly analyze the coverage and to communicate with the insured the basis of their decision." Spotts also noted that the claim file contained nothing regarding Lewis's food spoilage, evacuation expenses, or additional living expenses, but those items should have been included in the file.

According to Spotts, notations in the claim payment log indicate that Lloyds had closed Lewis's Hurricane Ike file on November 22, 2008. It was Spotts's opinion that closing the file on that date was not reasonable because "there had been very little or no investigation into the Ike case by either the field adjuster or Mr. Rendo at National Lloyds." Spotts testified that the file contains no documentation that anyone from Lloyds had ever telephoned Lewis. According to Spotts, the first entry on Lloyds's "messages for claims" screen pertaining to

18

Lewis's claim was the date the file was closed. Spotts explained that the first entry should be the date Lloyds received the claim and set up a file, and he characterized the lack of entries other than the date the file was closed as "unreasonable" and "very unusual." Spotts testified that Lloyds's letter to Lewis does not explain why Lloyds was not going to compensate her for the items Zepeda included in his estimate. Spotts explained that, if an insurance company is going to deny portions of a claim, both the policy itself and the Texas Insurance Code require that the company explain the reason.

According to Spotts, the letter advising Lewis that no additional payment was warranted for the roof fails to address "many of the issues at the house," and "it misrepresents the policy. It tells her that there's no coverage because she hasn't replaced her roof. . . . That's not in the policy. So, it's what I call a misrepresentation." According to Spotts, Lewis's ACF policy "has no replacement cost requirement that mandates that she spend money a certain way in order to recover a replacement cost claim." When asked about testimony that the roof was a total constructive loss after Hurricane Rita, Spotts testified that Lloyds "had three years to figure it out if they wanted to do something about it." Spotts testified that Lloyds's investigation was "below standard[,]" "poor, and . . . reflects the lack of

an investigation in this case. Reflects, I think the company's attitude towards this claim."

Spotts testified, "before I make a determination that there's no coverage on a claim, I want to know everything there is to know so that I can make an informed decision, because I'm the only advocate in this process for the insured. They're depending on me to get it right." Spotts further testified that Lloyds's file contained no evidence that Rendo "discussed the claim with anyone, either the insured or Mr. Zepeda. . . . At a minimum[,] that should have happened." Additionally, Spotts explained that Lloyds's claims file does not indicate that anyone from Lloyds had evaluated the quality of Lewis's prior roof repairs before denying her claim. Spotts testified, "if they're basing their coverage determination on that information and they don't have that information, they cannot accurately assess the coverage in the case." Spotts believed that Lloyds should have assessed the quality of Lewis's repairs as part of its investigation. Furthermore, Spotts testified that Lloyds's letters to the Texas Department of Insurance and FEMA contained misrepresentations regarding Lewis's coverage. Finally, Spotts testified that nothing in Lloyds's claims file, the letter to FEMA, or the letter to the Texas Department of Insurance set forth Lloyd's contention that Lewis had failed to properly protect the property from further damage. When asked his opinion about

20

Lloyds's handling of Lewis's claim, Spotts opined, "I believe they were not prompt, fair, or equitable to her."

The jury found that Lloyds failed to comply with the terms of Lewis's policy, knowingly violated the DTPA, and failed to comply with its duty of good faith and fair dealing to Lewis. The jury found that Lewis's actual damages for breach of contract were $56,822.69; her actual damages under the DTPA were $66,822.69 ($56,822.69 plus mental anguish damages of $10,000); Lewis's additional damages under the DTPA were $133,645.38 (apparently calculated by doubling the actual DTPA damages of $66,822.69); and Lewis's actual damages for Lloyds's breach of its duty of good faith and fair dealing were $8467. In addition, the jury found that Lloyds's breach of its duty of good faith and fair dealing resulted from malice or gross negligence and awarded Lewis $300,000 in exemplary damages. The trial court's judgment awarded Lewis $45,791.13 as damages for Lloyds's non-compliance with the prompt payment provisions of the Texas Insurance Code[3] and awarded Lewis a total of $871,738.06, as well as post-judgment interest and damages.

## ISSUE ONE

In its first issue, Lloyds contends the evidence of causation was legally insufficient. Specifically, Lloyds asserts that Norman's expert testimony on

---

[3]The trial court's judgment stated that it calculated the damages by multiplying the actual damages of $56,822.69 by eighteen percent per year times 4.477 years.

21

causation was "neither relevant nor reliable[,]" constituted nothing more than unreliable say-so grounded in inaccurate facts, and Wiener's repair estimate "was disclosed less than 30 days prior to trial and devised to support an opinion without a reliable basis[.]" Lloyds argues that, pursuant to the doctrine of "concurrent causation," when "covered and non-covered perils combine to create a loss, the insured is only entitled to recover that portion of the damage the covered peril caused." According to Lloyds, three hurricanes damaged Lewis's property, but her policy only covered damage caused by Hurricane Ike. Lloyds contends Lewis failed to show that the damages she sought in the litigation stemmed solely from Hurricane Ike and failed to differentiate between "non-covered perils and covered perils." Lloyds further asserts that Norman's testimony was unreliable and, therefore, cannot constitute legally sufficient evidence. According to Lloyds, Norman's opinions are conclusory, and the analytical gap between the data and the opinion proffered is too great. Lloyds argues that Wiener's testimony was unreliable and conclusory, and that Wiener's repair estimate was inadmissible because it was disclosed less than thirty days prior to trial.

In a legal sufficiency review, we are to "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is

22

legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *Id*. We will sustain a legal sufficiency challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact; (2) rules of law or rules of evidence bar the court from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a fact that is at issue in the appeal. *Id*. at 810. "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Kroger Tex. Ltd. P'Ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)). The jury is the sole judge of the credibility of the witnesses and is responsible for resolving any conflicts in the evidence, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *City of Keller*, 168 S.W.3d at 819-21; *S.W. Bell Tele. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004).

Under Rule 702 of the Texas Rules of Evidence, the party seeking to admit expert testimony must establish that (1) the expert is qualified to render an opinion on the subject matter and (2) the testimony is relevant to the issue in the case. Tex. R. Evid. 702; *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010).

23

Expert testimony must rely on sufficient data and proper methodology. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 905-06 (Tex. 2004); *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 257 (Tex. 2004). "An expert's bare opinion will not suffice." *Ramirez*, 159 S.W.3d at 906. If the analytical gap between the offered opinion and the underlying data is too great, the expert testimony is unreliable. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 39 (Tex. 2007); *see Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). A trial court must act as a gatekeeper to screen out unreliable expert evidence. *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 590 (Tex. 1999); *see E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556-57 (Tex. 1995). The examination of an expert's methodology, technique, or foundational data is a task for the trial court in its role as gatekeeper. *Coastal Transp. Co., Inc. v. Crown Central Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004). A *Robinson* determination is "not an analysis that should be undertaken for the first time on appeal." *Id*. Requiring the trial court to first address the issue insures that a full record will be developed and an appellate court will be able to evaluate the sufficiency of the evidence without looking beyond the appellate record. *Id*.

We conclude that the record supports the trial court's decision to admit Wiener's report into evidence. *See* Tex. R. Civ. P. 193.6(b). Lloyds knew of

24

Wiener's identity, qualifications, and methodology well before trial, and the record does not reflect that Wiener's change in the amount of hurricane damages impaired Lloyds's ability to prepare for trial or otherwise unfairly surprised or prejudiced Lloyds. *See Exxon Corp. v. West Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex. 1993) (concluding that admitting an expert's revised calculation less than thirty days before trial was permissible under former Tex. R. Civ. P. 166b); *see also* Tex. R. Civ. P. 193.6(a)(2). Having determined that Lewis produced legally sufficient evidence of causation and that the trial court did not err by admitting Wiener's report into evidence, we overrule issue one.

## ISSUE FOUR

In issue four, Lloyds argues that the evidence was legally insufficient to support the jury's award of $10,000 to Lewis for mental anguish. To prevail on a mental anguish claim, a plaintiff must present direct evidence of the nature, duration, and severity of her mental anguish, and prove a substantial disruption in her daily routine. *Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 860 (Tex. 1999); *Saenz v. Fidelity & Guar. Ins.*, 925 S.W.2d 607, 614 (Tex. 1996); *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). Plaintiff's evidence must demonstrate more than worry, anxiety, vexation, embarrassment, or anger. *Parkway*, 901 S.W.2d at 444. "Courts should 'closely scrutinize' awards of mental anguish

25

damages." *O'Byrne*, 996 S.W.2d at 860 (quoting *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex. 1997)). While the impossibility of precisely evaluating mental anguish requires that juries be given a measure of discretion, such discretion is limited, and the amount awarded must fairly and reasonably compensate for the loss. *Saenz*, 925 S.W.2d at 614.

As discussed above, Lewis testified that after Hurricane Ike damaged her home, she felt "horrible" and she cried when it rained. Lewis also described the "horrible" feeling of having her children tell her it was raining inside the house. In addition, Lewis introduced evidence that her home was partially uninhabitable from when Hurricane Ike struck in September 2008 until she moved out in the middle of 2011 for the home to be demolished, and that Lloyds denied her claim for the damage to her roof. The jury was responsible for drawing reasonable inferences from basic facts to ultimate facts. *See City of Keller*, 168 S.W.3d at 819; *see also Auto Ins. Co. of Hartford v. Davila*, 805 S.W.2d 897, 907 (Tex. App.— Corpus Christi 1991, writ denied), *overruled on other grounds by Hines v. Hash*, 843 S.W.2d 464 (Tex. 1992) (In case involving wrongful denial of fire insurance benefits, evidence was sufficient because the jury could infer mental anguish from such circumstances as the unrepaired condition of plaintiffs' home, their shortage of clothes and furniture, and their living conditions.). We conclude that Lewis

26

introduced legally sufficient evidence of the nature, duration, and severity of her mental anguish, as well as a disruption in her routine, to support the modest award of $10,000. *See O'Byrne*, 996 S.W.2d at 860; *Saenz*, 925 S.W.2d at 614; *Woodruff*, 901 S.W.2d at 444; *Davila*, 805 S.W.2d at 907. Accordingly, we overrule issue four.

## ISSUE FIVE

In its fifth issue, Lloyds challenges the legal sufficiency of the evidence supporting the jury's award of damages for breach of contract, DTPA, and punitive damages, and also complains of alleged charge error regarding questions two, five, seven, and nine. We first address Lloyds's sufficiency challenge.

With respect to Lloyds's challenge to the sufficiency of the evidence supporting the damages for breach of contract, our review of the trial court's judgment reveals that the trial judge did not award damages for breach of contract to Lewis in its judgment. Because the breach of contract finding and damages are not part of the judgment, we need not address the legal sufficiency of the supporting evidence. *See* Tex. R. App. P. 47.1. For similar reasons, which are fully explained in our discussion of Lloyds's seventh issue below, we also need not address the legal sufficiency of the evidence supporting the award of exemplary

27

damages for breach of the duty of good faith and fair dealing in the amount of $300,000 or Lloyds's complaint that the exemplary damages are excessive. *See id.*

We turn now to the legal sufficiency of the evidence supporting the jury's award of damages pursuant to the DTPA. The jury found that Lloyd's made false representations relating to an insurance policy; misrepresented a material fact or policy provision relating to coverage; failed to make a good faith attempt to effectuate a prompt, fair, and equitable settlement of Lewis's claim when Lloyds's liability had become reasonably clear; and failed to promptly provide Lewis a reasonable explanation of the factual and legal basis for denying her claim. The jury awarded economic damages of $56,822.69 for the DTPA violations, as well as mental anguish damages of $10,000, for a total of $66,822.69. In addition, the jury determined that Lloyds committed the DTPA violations knowingly and awarded additional damages in the amount of $133,645.38. Lloyds does not raise an issue challenging the jury's finding that Lloyds violated the DTPA, but challenges the amount of DTPA damages.

The jury heard evidence from Boswell that Lewis's policy did not contain language requiring her to replace her entire roof after receiving an insurance payment. Boswell also testified that Lloyds did not pay for Lewis's evacuation or living expenses because her home was not completely uninhabitable. That

representation was made to FEMA, even though there was no such requirement in Lewis's policy. In addition, the jury heard Boswell testify that the letters Lloyds sent to Lewis probably did not comply with Lloyds's obligation to explain to Lewis its reasons for denying her claim. The jury also heard testimony that the basis for denying Lewis's claim was that she had not replaced the roof after her 2005 Hurricane Rita claim. In addition, the jury heard testimony from Spotts that (1) Rendo and Zepeda lacked adequate experience to properly adjust Lewis's claim, (2) Lloyds closed its file on Lewis's claim although Zepeda and Rendo had done "little or no investigation" of Lewis's claim, and (3) Lloyds's letter to Lewis does not adequately explain why she would not be compensated for the items Zepeda had included in his estimate, and it misrepresents the terms of Lewis's policy. The jury heard Spotts testify that Lloyds lacked a basis not to pay Lewis for her Hurricane Ike claim, and opine that Lloyd's was not prompt, fair, or equitable to Lewis.

Moreover, the jury heard Lewis's testimony that she paid $54,000 for her home, and both Lewis and Boswell testified that the policy limit of Lewis's policy with Lloyd's was $54,000. Boswell explained that Lewis's policy provided $5000 coverage for additional incurred expenses. Furthermore, Lewis testified as to replacement costs for her son's bed, mattress set, dresser, television, air purifier,

29

clothing, and a table, in the amount of $1210, and she also testified concerning the $200-300 of additional expenses that she incurred as a result of evacuating. When an owner is familiar with property's value, "the owner of the property can testify to its market value, even if [s]he could not qualify to testify about the value of like property belonging to someone else." *Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984).

Crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we conclude that the evidence would enable reasonable and fair-minded people to reach the verdict under review and, therefore, is legally sufficient. *See City of Keller*, 168 S.W.3d at 827. The jury's award of actual damages under the DTPA is supported by legally sufficient evidence. In addition, the jury's award of additional DTPA damages in the amount of $133,645.38, which is twice the sum of the economic damages and the mental anguish damages, is also supported by legally sufficient evidence. *See id*. Accordingly, we overrule the sufficiency argument presented in issue five. To the extent Lloyds contends the additional DTPA damages were excessive, the record does not support Lloyds's argument. Rather, we conclude that both the amount of economic damages and the amount of the additional DTPA damages

assessed were supported by the evidence. Accordingly, we overrule Lloyds's claim that the damages assessed under the DTPA were excessive.

We now turn to the charge error portion of Lloyds's fifth issue. We need not address Lloyds's contentions with respect to questions regarding breach of contract or breach of the duty of good faith and fair dealing, nor need we address Lloyd's argument that questions two and five permitted Lewis a double recovery, as explained more fully in our analysis of issue seven below. *See* Tex. R. App. P. 47.1.

To preserve a complaint regarding error in the charge, a party must timely and plainly make the trial court aware of the complaint and obtain a ruling. *State Dept. of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992); *see also In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003). Lloyds complains that question five is defective because it "improperly define[d] the manner in which the amount payable under the subject insurance policy should be determined" and the trial court's definition of "actual cash value" is erroneous. The record of the charge conference reflects that the defense objected to question five of the charge "on the ground that there's no legally sufficient evidence to support an award of damages in favor of the plaintiff for any alleged unfair deceptive act or practice." Lloyds also objected to question five on the grounds that it should not include a definition

of "actual cash value" and should not include damages for loss of use, personal property, money incurred in making temporary repairs, damages to the dwelling, and damages to other structures. Lloyds seems to argue on appeal that the trial court's definition of "actual cash value" was erroneous because the insurance policy defined the term differently. Complaints on appeal must comport with objections made at trial. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We conclude that Lloyds failed to preserve the alleged error in question five for appellate review. *See Payne*, 838 S.W.2d at 241; *B.L.D.*, 113 S.W.3d at 349; *see also In re A.V.*, 113 S.W.3d at 362; *see also* Tex. R. App. P. 33.1(a).

Lloyds complains that question seven is defective "in its own right and as a consequence of the error associated with" question five. In particular, Lloyds argues that question seven is tied to question five, which Lloyds asserts improperly defined "actual damages" and "by extension, improperly instructs the jury as to the appropriate damage basis and limitation on the amount of additional damages it may award." Lloyds also contends that question seven was improper because the evidence was legally insufficient to support an award of both actual DTPA damages and additional DTPA damages.

We have already addressed the sufficiency of the evidence as to both types of DTPA damages the jury awarded, and we have held that Lloyds waived any

32

alleged defect in question five by failing to object at the charge conference. We therefore turn to Lloyds's contention that question seven improperly instructed the jury as to the damages it could award. Lloyds argues that there is no set of numbers "that the jury could have justifiably provided . . . that, even if tripled, could total $133,645.38." Question seven instructed the jury that it could award additional damages not to exceed three times the amount of the actual damages, if any, that it had awarded in question five. As discussed above, legally sufficient evidence supported the jury's award of $66,822.69 in its answer to question five. Lloyds's brief does not adequately explain the legal and factual basis for its argument that the jury's answer to question seven, in which the jury apparently simply doubled the amount of damages it had awarded in question five, should be disregarded. We overrule the charge error portion of Lloyds's fifth issue. Having now addressed all of the arguments raised in issue five, we overrule issue five in its entirety.

## ISSUE THREE

In its third issue, Lloyds argues that the trial court erred by refusing to include a spoliation instruction "because Lewis had a duty to preserve her home, she breached that duty, and the resulting spoliation of evidence prejudiced [Lloyds's] ability to present its case." After the parties filed their briefs in this appeal, the Texas Supreme Court decided *Brookshire Brothers, Ltd. v. Aldridge*. In

33

*Aldridge*, the Supreme Court held that because a spoliation instruction is based on a presumption of wrongdoing rather than mere negligence, "a party must intentionally spoliate evidence in order for a spoliation instruction to constitute an appropriate remedy." *Aldridge*, 438 S.W.3d 9, 23-24 (Tex. 2014). The Supreme Court explained that "[b]y 'intentional' spoliation, often referenced as 'bad faith' or 'willful' spoliation, we mean that the party acted with the subjective purpose of concealing or destroying discoverable evidence." *Id*. at 24. Accordingly, the Court held that "a trial court's finding of intentional spoliation . . . is a necessary predicate to the proper submission of a spoliation instruction to the jury." *Id*. at 25. The Supreme Court qualified its broader holding by providing a means for the trial court to give a spoliation instruction "if the act of spoliation, although merely negligent, so prejudices the nonspoliating party that it is irreparably deprived of having any meaningful ability to present a claim or defense." *Id*. at 25-26.

The record reflects that Lewis made a claim for her damages from Hurricane Ike in the fall of 2008, filed suit against Lloyds on September 9, 2010, and remained in the home until approximately mid-2011, when she moved out so that the house could be demolished and rebuilt. Nothing in the record suggests that Lewis intentionally selected the demolition date in an attempt at spoliation, nor does the record suggest that the alleged spoliation irreparably deprived Lloyds of

34

any meaningful ability to present a claim or defense; rather, the record reflects that Lloyds vigorously defended itself. *See id.* at 23-26. We conclude that the trial court did not err by refusing to submit Lloyds's requested spoliation instruction. We therefore overrule issue three.

## ISSUE SIX

In issue six, Lloyds argues the trial court erred by failing to include an excessive demand question "and when it included an award of attorneys' fees in the judgment." According to Lloyds, Lewis failed to satisfy "the condition precedent of proper pre-suit notice and demand under each of her statutory theories of recovery" and did not introduce evidence that she presented her claim for attorney's fees to Lloyds. Lloyds asserts that Lewis tendered her pre-suit demand "solely to the trial court, over National Lloyds' objection." Lloyds maintains that Lewis's counsel made an excessive pre-suit demand for $160,873.15, which "undeniably included payment for uncovered damage caused by prior storms as well as a value that failed to account for any depreciation[,]" and that the demand was based upon Wiener's initial report, which failed to account for depreciation. Lloyds also argues that Lewis demanded payment under a replacement cost value basis (RCV) rather than an ACV basis.

35

We first address Lloyds's argument that the trial court erred by awarding attorney's fees in its judgment because Lewis made an excessive demand. Lloyds points the Court to Lewis's DTPA demand letter of August 29, 2011, to Lloyds's counsel. In that demand letter, Lewis demanded property damages of $51,105.74, damages to the contents of her home in the amount of $1210.00, minus the deductible, for a total of $51,775.74 owed under the policy, and she also claimed $32,748.15 in statutory interest, attorney's fees of $56,349.26, and mental anguish in the amount of $20,000, for a total demand of $160,73.15. The letter also stated that Lewis reserved "the right to adjust these amounts to conform to the information and evidence that will be available to us at the time of trial[.]" Lloyds also directs the Court to Boswell's testimony that Lloyds initially offered Lewis $60,000 to settle the claim and later offered $100,000.

Excessive demand is an affirmative defense to an award of attorney's fees. *Kurtz v. Kurtz*, 158 S.W.3d 12, 21 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). The "'dispositive inquiry for determining whether a demand is excessive is whether the claimant acted unreasonably or in bad faith.'" *Pratt v. Trinity Projects, Inc.*, 26 S.W.3d 767, 769 (Tex. App.—Beaumont 2000, pet. denied). (quoting *Allstate Ins. Co. v. Lincoln*, 976 S.W.2d 873, 876 (Tex. App.—Waco 1998, no pet.). Nothing in the record indicates that Lewis made her pre-suit

36

demand unreasonably or in bad faith. *See Pratt*, 26 S.W.3d at 769; *Lincoln*, 976 S.W.2d at 876. The trial court therefore did not err by including an award of attorney's fees in its judgment. We overrule issue six.

The trial court shall submit instructions and definitions as shall be proper to enable the jury to reach a verdict and which are raised by the written pleadings and evidence. Tex. R. Civ. P. 277, 278. We review alleged jury charge error under an abuse of discretion standard. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh'g); *Lake Conroe Med. Ctr., Ltd. v. KMT Bldg. Co.*, 290 S.W.3d 541, 548 (Tex. App.—Beaumont 2009, no pet.). We may not reverse for charge error unless the error "probably caused the rendition of an improper judgment[.]" Tex. R. App. P. 44.1(a)(1); *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). To determine whether an alleged error in the jury charge is reversible, we consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. *Island Recreational Dev. Corp. v. Rep. of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986). "Charge error is generally considered harmful if it relates to a contested, critical issue." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009).

To be included in the charge, a question or instruction must be supported by the pleadings and the evidence. *See* Tex. R. Civ. P. 278; *Thota v. Young*, 366

37

S.W.3d 678, 693 (Tex. 2012). Lloyds raised the issue of excessive demand in its pleadings. However, as explained above, the evidence did not demonstrate that Lewis made an excessive demand. In addition, assuming without deciding that the trial court erred by failing to submit an excessive demand question to the jury, we conclude that a review of the evidence presented and the charge in its entirety does not demonstrate that the alleged error related to a contested, critical issue, nor does the record demonstrate that the alleged error probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Hawley*, 284 S.W.3d at 856; *Shupe*, 192 S.W.3d at 579. Accordingly, we overrule the charge error portion of issue six.

## ISSUE TWO

In its second issue, Lloyds argues that the trial court erred by submitting waiver questions in question one of the jury charge, which was the breach of contract question, "because waiver was neither raised in the pleadings nor supported by the evidence." Specifically, Lloyds asserts that including an invalid waiver instruction in the threshold liability question constitutes reversible error because the *Casteel* presumption of harm applies. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000). As we have noted above, and will discuss in greater detail in issue seven, the trial court's judgment did not include a recovery

for breach of contract. Rather, the trial awarded Lewis damages under the DTPA. Assuming without deciding that the trial court erred by submitting the waiver instruction with question one, because the jury's answer to question one was not included as a basis of the trial court's judgment, any alleged error in the submission of question one did not cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a); *see also City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995) ("Submission of an improper jury question can be harmless error if the jury's answers to other questions render the improper question immaterial. A jury question is considered immaterial . . . when its answer cannot alter the effect of the verdict.") (citation omitted). Accordingly, we overrule issue two.

## ISSUE SEVEN

In issue seven, Lloyds contends the trial court erred in rendering a judgment that failed to force Lewis to make an election of remedies. Although the trial court's judgment recites that the jury's verdict entitles Lewis to a judgment for breach of contract in the amount of $56,822.69, our review of the judgment reveals that the trial court only awarded Lewis the economic damages of $56,822.69 once, and it did so by electing for her the greater recovery, DTPA, rather than breach of contract. However, it appears that the trial court may have included other elements

39

in the judgment, such as breach of the good faith and fair dealing and attorney's fees, which might result in a double recovery.

In her brief, Lewis basically concedes error and asks this Court to modify the trial court's judgment to award her DTPA damages of $200,468.07; trial attorney's fees in the amount of $300,000; appellate attorney's fees in the amount of $20,000; contingent appellate attorney's fees for proceedings in the Supreme Court if Lloyds petitions for review; prejudgment interest in the amount of $15,822.24, prompt payment damages of $45,791.13; costs of $20,563.05; and post-judgment interest at the rate of five percent. Lloyds does not further discuss issue seven in its reply brief. We sustain issue seven and modify the trial court's judgment to award Lewis DTPA damages of $200,468.07, trial attorney's fees in the amount of $300,000, appellate attorney's fees in the amount of $20,000, contingent appellate attorney's fees for proceedings in the Supreme Court if Lloyds petitions for review, prejudgment interest in the amount of $15,822.24, prompt payment damages of $45,791.13, costs of $20,563.05, and post-judgment interest at the rate of five percent. *See generally Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 613 (Tex. App.—Fort Worth 2006, pet. denied) ("If the trial court does not do so, the appellate court must use the findings awarding the

greatest theory of recovery and render judgment accordingly."); *see also* Tex. R.

App. P. 43.2(b). We affirm the trial court's judgment as modified.

AFFIRMED AS MODIFIED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on September 25, 2014
Opinion Delivered February 19, 2015

Before McKeithen, C.J., Kreger and Horton, JJ.